## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

AMY KISSINGER-STANKEVITZ, )
*et al.*, )
           )
           Plaintiffs, )
           )
v. )      Civil Action No. 3:23-cv-364–HEH
           )
TOWN OF TAPPAHANNOCK, *et al.*, )
           )
           Defendants. )

## MEMORANDUM OPINION
### (Resolving Motions to Dismiss)

THIS MATTER is before the Court on Plaintiff and Counterclaim Defendant Amy Kissinger-Stankevitz's ("Ms. Kissinger-Stankevitz") and Counterclaim Defendant Christian Stankevitz's ("Mr. Stankevitz") Motion to Dismiss the Counterclaim ("Stankevitz's Motion," ECF No. 23); Defendants Olivia Hurd's ("Ms. Hurd" or "Officer Martin"[1]) Motion to Dismiss ("Hurd's Motion," ECF No. 67); Deanne Walsh's ("Specialist Walsh") Motion to Dismiss ("Walsh's Motion," ECF No. 69); Judson Collier's ("Attorney Collier") Motion to Dismiss ("Collier's Motion," ECF No. 71); Dr. David Bailey's ("Dr. Bailey"), Dr. Jack Chiles' ("Dr. Chiles"), and Mary Chiles' ("Mrs. Chiles") Motion to Dismiss ("Dr. Bailey's Motion," ECF No. 73); Vincent Donoghue's ("CA Donoghue") Motion to Dismiss Pursuant to Rule 12(b)(1) ("Donoghue's 12(b)(1)

---

[1] Since the commencement of the action, Officer Olivia Hurd has since changed her name to Olivia Martin. (ECF No. 60, at 1 n.1). The Amended Complaint also reflects this change. Accordingly, the Court will refer to Officer Martin throughout its discussion.

Motion," ECF No. 75) and Motion to Dismiss Pursuant to Rule 12(b)(6) ("Donoghue's

12(b)(6) Motion," ECF No. 77); and Town of Tappahannock's ("Tappahannock" or the

"Town") Motion to Dismiss ("Tappahannock's Motion," ECF No. 92). The parties have

submitted extensive memoranda in support of their respective arguments, and the Court

heard oral argument on May 14, 2024. The Court will resolve the motions as follows.

## I. AMENDED COMPLAINT BACKGROUND

At this stage, the Court assumes the following allegations as true. Dr. Bailey and

Ms. Kissinger-Stankevitz were married on August 20, 2011, and had a son, N.B., on

April 22, 2013. (Am. Compl. ¶¶ 26, 31, ECF No. 63; Countercl. ¶¶ 16, 20–21, ECF No.

16.) Ms. Kissinger-Stankevitz has two (2) children from her previous marriages, V.D.

and E.T. (Countercl. ¶ 19.) In 2015, due to an incident of family abuse, the Chesapeake

Juvenile and Domestic Relations Court issued a two-year no-contact order against Dr.

Bailey, prohibiting him from communicating with Ms. Kissinger-Stankevitz and their

son. (Am. Compl. ¶ 26.) Dr. Bailey also has a prior misdemeanor conviction for Secret

Peeping under North Carolina State Code § 14-202. (*Id.* ¶ 27.) After these incidents,

Mrs. Chiles, N.B.'s paternal grandmother, initiated custody proceedings against Ms.

Kissinger-Stankevitz to gain custody over N.B. (*Id.* ¶ 28.) The parties ultimately agreed

that Ms. Kissinger-Stankevitz would retain primary custody of N.B. and Dr. Bailey

would have unsupervised visitations with N.B. every other weekend. (*Id.*) Dr. Bailey

began his unsupervised visitations in March 2018. (*Id.* ¶ 29.) Approximately two (2)

months later, N.B. "began exhibiting sexualized behavior" and "behavioral problems."

(*Id.*) Dr. Bailey then "elected to relitigate his custody battle over N.B. through contesting

2

divorce against [Ms. Kissinger-Stankevitz]." (*Id.* ¶ 30.) In these proceedings, Dr. Bailey argued that Ms. Kissinger-Stankevitz was "'mentally unstable' and that she was fabricating N.B.'s sexualized behaviors." (*Id.* ¶ 31.)

In August 2019, "Bailey admitted to showing N.B. a video depicting oral sex." (*Id.* ¶ 32.) N.B. was six (6) years old at this time. (*Id.*) In December 2019, Ms. Kissinger-Stankevitz reported this to the Tappahannock Police Department (the "Department"). (*Id.* ¶ 33.) Officer Martin was assigned to the case, and it was her first sexual abuse investigation. (*Id.*) Plaintiffs argue that Officer Martin was not properly trained by the Tappahannock Police Department which led to a subpar investigation against Dr. Bailey. (*Id.*) Essex Department of Social Services ("EDSS") Specialist Walsh also worked on the investigation. (*Id.* ¶ 34.) In January 2020, Officer Martin and Specialist Walsh conducted a forensic interview of N.B. (*Id.*) N.B. stated that he watched sexual material with Dr. Bailey. (*Id.*) However, "[Officer] Martin did not pursue an action against [Dr.] Bailey under Virginia Code § 18.2-371 for causing or encouraging acts rendering children delinquent." (*Id.*) "N.B. began exhibiting uncontrollable behavior at school" which resulted in multiple suspensions in 2021. (*Id.* ¶ 36.)

Due to his behavioral issues at school, N.B. was referred to the Children's Hospital of the King's Daughters ("CHKD") for an evaluation. (*Id.* ¶ 37.) On May 6, 2021, N.B. disclosed to a CHKD nurse that he had been sexually abused by Dr. Bailey. (*Id.*) CHKD reported N.B.'s disclosure to EDSS. (*Id.*) However, "Martin refused to consider[] the legitimacy of N.B.'s allegations against his father," and, instead, "began to

investigate [Ms. Kissinger-Stankevitz] under the pretext of investigating [Dr.] Bailey on

N.B.'s allegations." (*Id.* ¶ 38.) Plaintiffs contend that "no member of the []

Tappahannock police force investigated Bailey for the sexual abuse of N.B." nor were

Plaintiffs informed of their rights. (*Id.* ¶¶ 39–40.)

Plaintiffs allege that Officer "Martin conspired with [CA] Donoghue, [Specialist]

Walsh, [Attorney] Collier, [Dr.] Bailey, [Mrs. Chiles] and [Dr.] Chiles to harm [Ms.

Kissinger-Stankevitz] both mentally and financially to attempt to cripple her ability to

defend herself and her child." (*Id.* ¶ 41.) Additionally, Defendants "conspired to attack

the credibility of N.B.'s disclosures of sexual abuse by [Dr.] Bailey, causing N.B. severe

emotional harm." (*Id.* ¶ 42.) "Officer Martin admitted under oath to destroying evidence

in violation of Virginia Code § 18.2-472" by turning off her body camera. (*Id.* ¶¶ 44–

45.) Officer Martin also admitted to "Defendants' scheme of continuing the pretext of

investigating Bailey" to "give her jurisdiction to charge [Ms. Kissinger-Stankevitz] with

perjury." (*Id.* ¶ 45.) Plaintiffs allege that Defendants conspired against her and her son

and conspired to protect Dr. Bailey. (*Id.* ¶¶ 45–50.)

Due to Ms. Kissinger-Stankevitz's suspicions surrounding the EDSS investigation,

on September 24, 2021, she requested that the Federal Bureau of Investigation ("FBI")

conduct a forensic interview of N.B." (*Id.* ¶ 51.) During the interview, N.B. made four

(4) credible disclosures of sexual abuse against Dr. Bailey. (*Id.*) Stephanie Wolf, Ph.D.,

a nationally recognized expert in child psychology, "opined that 'N.B.'s disclosures are

consistent with N.B. having experienced sexual abuse by his father." (*Id.* ¶ 52.) EDSS

worker Brittany Hodges also reported "founded child abuse against [Dr.] Bailey." (*Id.*

¶ 53.) Upon discovering N.B.'s four (4) credible disclosures, Defendants continued to conspire against Plaintiffs and to protect Dr. Bailey, including pressuring EDSS to reverse the finding of sexual abuse against Dr. Bailey, committing perjury, and threatening Ms. Kissinger-Stankevitz with criminal charges. (*Id.* ¶¶ 55–64.)

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1)

A Rule 12(b)(1) motion challenges the Court's jurisdiction over the subject matter of a complaint. Such a challenge can be facial, asserting that the facts as pled fail to establish jurisdiction, or factual, disputing the pleadings themselves and arguing that other facts demonstrate that no jurisdiction exists. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). For a facial challenge, "the plaintiff is 'afforded the same procedural protection as she would receive under a Rule 12(b)(6) consideration.'" *Id.* (quoting *Kerns*, 585 F.3d at 192). Here, Defendant CA Donoghue brings a facial challenge to Count II under Rule 12(b)(1) for lack of standing.

Subject-matter jurisdiction requires a justiciable case or controversy within the meaning of Article III of the United States Constitution. *See Allen v. Wright*, 468 U.S. 737, 750–51 (1984) (*abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 574 U.S. 118 (2014)). Standing constitutes one component of justiciability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing presents a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The Supreme Court has established that the "irreducible constitutional minimum" of standing includes three elements: (1) an injury-in-fact, (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61 (citations and quotations omitted). Because Plaintiffs seek to invoke this Court's jurisdiction, Plaintiffs bear the burden of establishing all three elements. *Id.* at 561.

To establish an injury-in-fact, a plaintiff "must allege a distinct and palpable injury to himself[.]" *Warth*, 422 U.S. at 501 (citations omitted). The injury must "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Additionally, claims asserting "'generalized grievance[s]' shared in substantially equal measure by all or a large class of citizens . . . normally do[] not warrant exercise of jurisdiction." *Warth*, 422 U.S. at 499 (citations omitted).

## B. Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)) (internal quotations omitted). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey*, 706 F.3d at 387) (alteration in original). However, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Allegations have

facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 678).

A court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)); *Iqbal*, 556 U.S. at 678. In considering such a motion, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

For a Rule 12(b)(6) motion, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citations omitted). A court may consider a document not attached to the complaint, when "the document [is] integral to the complaint and there is no dispute about the document's authenticity." *Id.* "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . ., the exhibit prevails." *Id.* (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)) (internal quotations omitted) (alteration in original).

## C. Federal Rule of Civil Procedure 12(h)(3)

Subject matter jurisdiction cannot be waived, and a party may assert the lack of jurisdiction "at any time." FED. R. CIV. P. 12(h)(3). "[A] federal court is obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction." *Lovern v.*

7

*Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).  Both standing and Eleventh Amendment immunity challenge the Court's jurisdiction to hear a case.  *See Indus. Srvs. Grp., Inc. v. Dobson*, 68 F.4th 155, 167–68 (4th Cir. 2023).

## III.  MOTIONS TO DISMISS THE AMENDED COMPLAINT

### A.  Lack of Standing for Donoghue

Before reaching the merits of a case, "the first and fundamental question is that of jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  Whether a plaintiff has standing to sue is a "bedrock constitutional requirement that [the United States Supreme Court] has applied to all manner of important disputes." *United States v. Texas*, 599 U.S. 670, 675 (2023).  "As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379 (2024) (citing Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)).  In response to that question, a plaintiff must present not just any interest, but a judicially cognizable interest at stake.  *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

Here, Defendant CA Donoghue argues Plaintiffs lack standing to challenge his prosecutorial decisions as the Commonwealth's Attorney.  (*See* Donoghue Mem. in Supp. of 12(b)(1) Mot. at 7–9, ECF No. 76.)  The Supreme Court has long held that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S.*, 410 U.S. at 619.  Ultimately, "a private citizen lacks a judicially cognizable interest in the prosecution or

8

nonprosecution of another." *Id.* Likewise, Courts of Appeals have routinely found plaintiffs lack standing when challenging decisions to investigate. *See Lefebure v. D'Aquilla*, 15 F.4th 650, 655 (5th Cir. 2021) (citing cases from the Second, Fourth, Fifth, Sixth, Seventh, Eighth, and District of Columbia Circuits); *see also Allen v. Olsen*, 1:23-cv-1010, 2023 WL 8480074, at *3 (E.D. Va. Nov. 8, 2023).  Accordingly, Plaintiffs cannot allege any cognizable injury from CA Donoghue's decisions regarding prosecutorial or investigatory decisions.

Despite Plaintiffs' contentions, several counts in the Amended Complaint simply amount to complaints against CA Donoghue's prosecutorial or investigatory decisions. Count II alleges CA Donoghue was responsible for the "final policy for the Town [of Tappahannock] regarding who they prosecute and who they do not" and "condoned [Officer] Martin's destruction of exculpatory evidence by declining to prosecute Martin." (Am. Compl. ¶ 76.)  Count III alleges CA Donoghue "protect[ed] [Dr.] Bailey from criminal liability and attack[ed] Ms. Kissinger-Stankevitz without any evidence." (*Id.* ¶ 80.)  The CA Donoghue's specific conduct that injured Plaintiffs was his investigation or noninvestigation of Ms. Kissinger-Stankevitz or Dr. Bailey. (*See, e.g., id.* ¶¶ 8, 55, 56, 58, 59.)  Count IV alleges CA Donoghue "faked an investigation of [Dr.] Bailey in order to harm" Plaintiffs in violation of the due process right to companionship, care, custody, and management of Ms. Kissinger-Stankevitz's child. (*Id.* ¶ 86.)  Plaintiffs lack standing to contest any of these prosecutorial decisions. *See Linda R.S.*, 410 U.S. at 619.

Additionally, CA Donoghue asserts sovereign immunity for all claims against him in his official capacity. Despite Plaintiffs' contentions, it is well-settled that in Virginia,

9

the Commonwealth's Attorney, as a constitutional officer, is entitled to Eleventh Amendment immunity. *See Davison v. Plowman*, 247 F. Supp. 3d 767, 780–81 (E.D. Va. 2017), *aff'd*, 715 F. App'x 298 (4th Cir. 2018). Accordingly, CA Donoghue is entitled to Eleventh Amendment immunity for all claims against him in his official capacity.

CA Donoghue also argues that he is entitled to prosecutorial immunity on every count. (Donoghue Mem. in Supp. 12(b)(6) at 7–8, ECF No. 78.) Prosecutors enjoy absolute immunity "during prosecutorial activities which can only be characterized as an 'integral part of the judicial process.'" *Imbler v. Pachtman*, 424 U.S. 409, 416 (1976) (quoting *Marlow v. Coakley*, 404 F.2d 70, 70 (9th Cir. 1968)). All other actions—those in their investigative or administrative capacities—are entitled to only qualified immunity. *See Nero v. Mosby*, 890 F.3d 106, 118 (4th Cir. 2018) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). Thus, the Fourth Circuit requires that courts assess the function of the conduct at issue to determine which immunity applies. *See id.* A prosecutor acts in an investigative or administrative capacity when they give "legal advice to police during an investigation, investigates a case before a probable cause determination, and personally attests to the truth of averments in a statement of probable cause." *See id.* (citations omitted). For the same reasons Plaintiffs lack standing, CA Donoghue is entitled to absolute immunity on Counts II, III, and IV.[2] A prosecutor cannot be liable for charging or not charging an individual. *See Buckley*, 509 U.S. at 273. However, CA Donoghue may be liable for *how* he conducted himself during the

---

[2] However, since the Court has already held it lacks jurisdiction, this conclusion has little effect.

investigation—that is, a prosecutor is not immune from tortious conduct separate from prosecutorial decisions, e.g., a battery during a witness interview. And here, the remaining counts focus on CA Donoghue's conduct with Officer Martin and others outside of the judicial process.

For these reasons, Counts II, III, and IV against CA Donoghue in his personal capacity will be dismissed without prejudice and Counts II through X against CA Donoghue in his official capacity will be dismissed without prejudice.[3]  Because Plaintiffs' remaining counts against CA Donoghue in his personal capacity are primarily based on discriminatory or conspiratorial conduct, *inter alia*, rather than prosecutorial decisions, Plaintiffs have established sufficient standing for the Court to address the merits of those claims.

## B.  Count I: Failure to Train pursuant to 42 U.S.C. § 1983 against Tappahannock

Plaintiffs assert they plead sufficient facts to plausibly show that it was "'obvious' and 'predictab[le]' that an officer lacking specific tools to handle [a] situation will violate citizen' rights." (Pls.' Resp. in Opp'n to Tappahannock at 5, ECF No. 95.)  Thus, Plaintiffs allege the Town's failure to train Officer Martin "to limit her actions to within the jurisdictional boundaries" and "on how to handle child sex abuse allegations" amounted to "deliberate indifference to Plaintiffs' due process rights." (*Id.* at 5–6.)

---

[3] Dismissal based on lack of standing or immunity requires dismissal without prejudice. *See Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 558 (4th Cir. 2024) (requiring dismissal without prejudice for lack of standing); *Allen v. Cooper*, 895 F.4th 337, 343 (4th Cir. 2018) (requiring dismissal without prejudice for Eleventh Amendment immunity).

Specifically, the "Town's failure to train Officer Martin on victim's rights pursuant to
§ 19.2-11.01 illustrates [the Town's] deliberate indifference to the constitutional right of
the non-abusing parent of that victim to the companionship, care, custody and
management of her child." (*Id.* at 6.)

Defendant Tappahannock argues that under 42 U.S.C. § 1983, the Town cannot be
held responsible for violations of any state law. (Tappahannock Mem. in Supp. at 5, ECF
No. 93.) Furthermore, Defendant Tappahannock contends Plaintiffs fail to adequately
plead with specificity what federal constitutional rights were purportedly violated. (*Id.*)
And finally, that Plaintiffs do not allege enough to prove the Town's decision to not train
police officers amounts to a "policy" as required under *Monell*. (*Id.* at 6.)

In *Monell v. Department of Social Services of City of New York*, the Supreme
Court expanded § 1983's applicability to municipalities; yet, in doing so, the Court also
limited the grounds on which a municipality may incur liability. 436 U.S. 658 (1978).
Municipalities "cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.*
at 691. Rather than incurring liability from its employees or agents, a municipality may
"itself inflict[] [a] constitutional injury by adopting a 'policy' or 'custom' which is the
'moving force' behind the constitutional injury." *Carter v. Fayette Cnty. Sheriff's Dep't*,
No. 2:23-cv-00812, 2024 WL 3823824, at *4 (S.D. W. Va. Aug. 14, 2024) (quoting
*Monell*, 436 U.S. at 694–95); *see also Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338
(4th Cir. 1994) ("[Plaintiff] must, therefore, adequately plead and prove the existence of
an official policy or custom that is fairly attributable to the municipality and that

proximately caused the deprivation of their rights."). A policy or custom can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation;
> (2) through the decisions of a person with final policymaking authority;
> (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens;" or
> (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003); *see also Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023). Generally, "proof of a single [isolated] incident of unconstitutional activity is not sufficient to impose liability under *Monell*, without other proof of an existing, unconstitutional policy." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24 (1985).

Here, Plaintiffs' allegations rest on finding a policy or custom on the second (final policymaker) and third prong (deliberate indifference to the rights of citizens). (*See* Pls.' Resp. in Opp'n to Tappahannock at 4.)

### i. Prong Two (2)—Donoghue's Final Policymaking Authority

Plaintiffs argue that CA Donoghue exercised final decision-making authority, making his decisions regarding the investigation with Officer Martin qualified as a "custom" or "policy" under *Monell*. (*Id.* at 7–9.) Defendant Tappahannock counters that CA Donoghue is a constitutional officer, not the final policymaker for the Town—rather, that authority rests in the Town Council and Mayor.

Whether an official has final policymaking authority is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988) ("[W]e can be confident that

13

state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.") The Supreme Court of Virginia is clear that "commonwealth's attorneys . . . do not hold their offices by virtue of authority of the General Assembly or by virtue of authority of a municipality or county." *Hilton v. Amburgey*, 96 S.E.2d 151, 152–53 (Va. 1957); *see also Burnett v. Brown*, 72 S.E.2d 394 (Va. 1952) (holding commonwealth's attorney was a constitutional officer); Va. Const. art. VII, § 4. Thus, "[w]hile constitutional officers may perform certain functions in conjunction with units of county or municipal government, neither the officers nor their offices are agencies of such governmental units." *Carraway v. Hill*, 574 S.E.2d 274, 276 (Va. 2003).

As the Commonwealth's Attorney for Essex County, CA Donoghue is undoubtedly a constitutional officer. Despite Plaintiffs' contention that CA Donoghue was delegated authority to make municipal policy for the Town, Plaintiffs have not identified any Virginia law that supports such a conclusion. (*See* Pls.' Resp. in Opp'n to Tappahannock at 8.) The Town of Tappahannock's Code of Ordinances grants full power to the town council to enact ordinances and policies in the town. *See* Tappahannock Code of Ordinances § 3-3.8. The Town Ordinances grants the Essex Circuit Court jurisdiction over cases, but it clearly distinguishes between Essex County, Virginia, and the Town of Tappahannock. *See id.* § 3-6.3. Nowhere does the Town delegate any authority to the Commonwealth's Attorney for Essex County. Courts posed with this very question unanimously agree that "[t]he Commonwealth's Attorney . . . is a

14

constitutional office and is not an officer or employee of a city or county." *Savage v. Cnty. of Stafford*, No. 1:09–cv–1328, 2010 WL 11527134, at *2 (E.D. Va. Mar. 26, 2010). And the Town Ordinances show that CA Donoghue is not even *functionally* exercising delegated authority from the Town. Consequently, Plaintiffs' argument that CA Donoghue was the final policymaker for the Town has no merit and Plaintiffs fail to adequately allege a custom or policy via the second *Monell* prong.[4] *See Carraway*, 574 S.E.2d at 276.

### ii. Prong Three (3)—Tappahannock's Failure to Train

Plaintiffs may also establish a custom or policy "through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens." *Lytle*, 326 F.3d at 471. Accordingly, Plaintiffs allege that the Town "failed to train its police officers to investigate and protect child victims of sexual abuse . . . display[ing] a deliberate indifference to [Plaintiffs'] due process rights." (Pls.' Resp. in Opp'n to Tappahannock at 8.) Specifically, Plaintiffs allege the Town failed to properly train Officer Martin which resulted in three constitutional violations, each of which constitute a § 1983 claim in this case: (1) violating "[Ms.] Kissinger-Stankevitz's right to preservation of exculpatory evidence" (Count II); (2) "shock[ing] the conscience in violation of the due process right to life and liberty" when Officer Martin exceeded her jurisdiction (Count III); and (3) "violat[ing] [Ms.] Kissinger-Stankevitz's due process

---

[4] Plaintiffs seem to concede that Officer Martin could not plausibly be construed as the final policymaker for the Town. Accordingly, the Court need not discuss her as a viable alternative to CA Donoghue.

right to the companionship, care, custody and management of her child" (Count IV). (*Id.* at 4.)

> To succeed on a failure to train claim, Plaintiffs must prove three elements:
>
> (1) [that] the subordinates actually violated the plaintiff's constitutional or statutory rights;
> (2) [that] the supervisor failed to train properly the subordinates thus illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and
> (3) [that] this failure to train actually caused the subordinates to violate the plaintiff's rights.

*Gallimore v. Henrico Cnty. School Bd.*, 38 F. Supp. 3d 721, 726 (E.D. Va. 2014) (citing *Brown v. Mitchell*, 308 F. Supp. 2d 682, 107 (E.D. Va. 2004); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

### 1. Deliberate Indifference

Since *Canton*, the U.S. Supreme Court has clarified that allegations of inadequate training must focus on "a deficient training 'program,' necessarily intended to apply over time to multiple employees." *Bd. of the Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 407 (1997). Policymakers can only be put on notice, and thereby exercise "deliberate indifference," when there is evidence of a pattern of constitutional violations. *Id.* Otherwise, policymakers would have little notice as to whether the tortious conduct arose from "lack of proper training" or "a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident." *Id.* at 408. The Supreme Court in *Canton* left open "the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations." *Id.* at 410. Yet, in doing so, the Court "simply hypothesized

16

that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* Courts have rarely found the lack of training in an area so likely to result in a violation of a constitutional right. *See Willis v. Blevins*, 966 F. Supp. 2d 646, 665 (E.D. Va. 2013) (Hudson, J.).

Furthermore, "[i]n resolving the issue of a [municipality's] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390. In *Willis*, this Court held that the plaintiff did not sufficiently plead with specificity the deficiencies in an officer's training with allegations of failing to train the officer in "proper *investigative procedure*; proper witness, *victim*, and suspect interview procedure; proper scene preservation and analysis; . . . and *basic constitutional rights afforded to suspects and defendants*." *Willis*, 966 F. Supp. 2d at 666 n.9 (emphasis added). Here, Plaintiffs allege Officer Martin lacked training to make her aware "of basic investigation technics used to build evidence against child abusers" (Am. Compl. ¶ 33) and lacked "specialized training on how to deal with child victims of sexual abuse, as well as the child's non-abusing parent" (*id.* ¶ 71). Because evidence that a single officer's training was deficient cannot attribute deficient training to the whole of the police force, *see Canton*, 489 U.S. at 390, Plaintiffs' allegations are "insufficient to establish any specific deficien[cies] in [the Town's] training regimen." *Willis*, 966 F. Supp. 2d at 666 n.9.

Plaintiffs argue that in lieu of showing any pattern of misconduct, it was "'obvious' and 'predictable that an officer lacking specific tools to handle [a] situation

17

will violate citizens' rights.'" (Pls.' Resp. in Opp'n to Tappahannock at 5.)  However, Plaintiffs again fail to point to any deficiencies *in actual training*.  In other words, Plaintiffs do not show that Officer Martin actually lacked any "specific tools" to handle the investigation. *See id.*  Moreover, "this alternate theory of failure to train liability, of course, is only available in situations where the underlying constitutional right is quite clear and is one that the subordinates reasonably can be expected to confront with some regularity." *Brown*, 308 F. Supp. 2d at 704–05.  The underlying constitutional rights alleged here are neither "quite clear" nor "confronted with some regularity." *See id.* Because Plaintiffs do not plead sufficient facts, Officer Martin's conduct cannot be attributed to the Town.

### 2. Actual Violations of Plaintiffs' Constitutional Rights

Even if Plaintiffs could sufficiently identify deficiencies in specific training and attribute Officer Martian's conduct to the Town, they do not allege Officer Martin "actually violated the plaintiff's constitutional or statutory rights." *See Gallimore*, 38 F. Supp. 3d at 726.  Under § 1983, Plaintiffs may seek redress for violations of their "*federal* constitutional and *federal* statutory rights." *Washington v. Jurgens*, No. 3:16-cv-184, 2016 WL 3661320, at *3 (E.D. Va. July 1, 2016) (Hudson, J.) (emphasis added). Plaintiffs loosely allege that the allegations in Counts II, III, and IV constitute constitutional violations the Town is liable for under Count I. (Pls.' Resp. in Opp'n to Tappahannock at 4.)  In the Complaint, Plaintiffs allege violations of Virginia Code § 19.2-11.01 and the Fourteenth Amendment's Due Process Clause right to life and

liberty, as well as Officer Martin's shocking-the-conscience violation of substantive due process. (Am. Compl. ¶¶ 68, 72, 83.)

While Virginia may waive sovereign immunity for violations of Virginia law against municipalities, "[c]onduct violating state law without violating federal law will not give rise to a § 1983 claim." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 145 (4th Cir. 2014). Accordingly, Virginia Code § 19.2-11.01 cannot be the basis for a § 1983 claim. For the reasons discussed in subsequent sections, Plaintiffs' Fourteenth Amendment allegations also fail to state a claim. *See infra* Sections III.C–F. Consequently, Plaintiffs do not adequately state a claim under *Monell* and Count I will be dismissed without prejudice.

### iii. Tappahannock's Liability for the Actions of Martin

Furthermore, insofar as Plaintiffs allege violations against Officer Martin in her official capacity, they constitute claims against the Town. *See King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016) (noting that in an official capacity suit "the suit is 'treated as a suit against the entity'"). "It is well established that the doctrine of sovereign immunity protects municipalities from tort liability arising from the exercise of governmental functions." *Niese v. City of Alexandria*, 564 S.E.2d 127, 132 (Va. 2002). All of Officer Martin's conduct described within the Complaint occurs within her capacity as a law enforcement officer for the Town of Tappahannock. Accordingly, any counts against Officer Martin in her official capacity are barred by sovereign immunity

likewise dismissed without prejudice.[5]  The claims against Officer Martin in her *personal* capacity are discussed in detail below.

### C. Count II: Violation of Due Process pursuant to § 1983 against Tappahannock, Donoghue, and Martin

In Count II, Plaintiffs allege that Officer Martin violated the Fourteenth Amendment's Due Process Clause by turning off her body camera.  Plaintiffs state that Officer Martin deliberatively turned off her body camera to suppress "a January 2020 interrogation of Dr. Bailey that . . . could be used to prove his abuse of N.B." and to "destroy[] contained exculpatory evidence that Ms. Kissinger-Stankevitz could use to defend herself against criminal charges . . . ." (Am. Compl. ¶¶ 61, 75.)  Therefore, Plaintiffs allege Officer Martin, in bad faith, intentionally violated Ms. Kissinger-Stankevitz's right to the preservation of exculpatory evidence. (*Id.*)  Defendants argue that Plaintiffs fail to state a constitutional claim.[6]

As the Court previously discussed, Officer Martin is entitled to sovereign immunity regarding any suit against her in her official capacity. *See supra* Section III.B.iii.  The question, then, is whether Plaintiffs properly state a claim against Officer Martin in her personal capacity and whether she is entitled to qualified immunity.  "When a government official is sued in their individual capacity, qualified immunity protects

---

[5] While Officer Martin is entitled to sovereign immunity for suits against her official capacity, she may still be entitled to qualified immunity for suits against her personal capacity. *See infra* Section III.C–F.  Here, the Court will dismiss Counts II through X insofar as they are against Officer Martin in her official capacity.

[6] Throughout the discussion of each count, the Court's use of "Defendants" collectively refers to only those Defendants relevant to that single count.

them 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 682–83 (4th Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The doctrine of qualified immunity provides "'government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Barrett v. PAE Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020) (quoting *Stanton v. Sims*, 571 U.S. 3, 5 (2013)). "The burden of establishing a qualified immunity defense rests on the official asserting the defense." *Wingate v. Fulford*, 987 F.3d 299, 311 (4th Cir. 2021).

Qualified immunity involves two (2) steps. *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 219 (4th Cir. 2018). State actors are protected by qualified immunity "unless (1) [the state actor] violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Yet, it is within the Court's discretion to determine which prong of the qualified immunity analysis to address first. *Pearson*, 555 U.S. at 236. The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curium)).

21

### i. Martin's Qualified Immunity

Plaintiffs' allegation is that Ms. Kissinger-Stankevitz's constitutional right was violated when Officer Martin turned off her body camera before an allegedly conspiratorial discussion. This claim, in essence, asks the Court to apply a *Brady*-like § 1983 claim to the "failure to *create* exculpatory evidence." *United States v. Aguirre-Cuenca*, Case No. 21-4307, 2023 WL 245710, at *3 (4th Cir. Jan. 18, 2023) (unpublished) (per curium). For the reasons that follow, Plaintiffs have failed to plausibly allege a clearly established right nor that a constitutional right was violated at all.

In *Arizona v. Youngblood*, the Supreme Court identified the requirements a plaintiff must prove in order to succeed on a due process claim for police misconduct in preserving exculpatory evidence. 488 U.S. 51 (1988). In *Aguirre-Cuenca*, the Fourth Circuit assumed without deciding that *Youngblood* applied to the failure to activate a body camera because the lower court had found the officer did not act in bad faith. *Aguirre-Cuenca*, 2023 WL 245710, at *3. It remains an open question in the Fourth Circuit whether a failure to create exculpatory evidence through body camera footage exists. *See id.; see also United States v. Spencer*, 2024 WL 1184714, at * 2 (W.D.N.C. Mar. 19, 2024) (dismissing a similar claim on other grounds). Accordingly, it cannot be held that the right is "clearly established."

Plaintiffs also fail to sufficiently allege a viable constitutional violation. To demonstrate that a state actor violated a constitutional right, the plaintiff must plead a due process claim by alleging "facts to show that [they were] deprived of 'life, liberty or

property, by governmental action.'" *Equity Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91,

109 (4th Cir. 2011). In order to present a claim based on the suppression of exculpatory

evidence, a plaintiff must satisfy three (3) elements: (1) the evidence was "favorable" to

the plaintiff(s), (2) the officer acted in "bad faith," and (3) the plaintiff suffered prejudice.

*See Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396–97 (4th Cir. 2014). The

undercurrent of a *Brady*-like § 1983 claim is the presence of a previous criminal trial.

*See, e.g., id.*; *Burgess v. Goldstein*, 997 F.3d 541, 552 n.4 (4th Cir. 2021) ("Bad faith

means that an officer 'intentionally withheld the evidence for the purpose of depriving

the plaintiff of the use of that evidence during his criminal trial.'" (quoting *Jean v.

Collins*, 221 F.3d 656, 663 (4th Cir. 2000))); *Gilliam v. Sealey*, 932 F. 3d 216, 224 (4th

Cir. 2019) (discussing the plaintiff's two trials giving rise to his claim).

   Although criminal defendants have a right to the preservation of exculpatory

evidence in criminal proceedings, *United States v. Mack*, 455 Fed. App'x. 323, 327 (4th

Cir. 2011), "unless a criminal defendant can show bad faith on the part of the police,

failure to preserve potentially useful evidence does not constitute a denial of due process

of law." *Id.* (quoting *Youngblood*, 488 U.S. at 58 (1988)). Furthermore, "even if a policy

violation occurred, mere failure to activate body cameras in violation of department

policy does not itself establish the bad faith that is essential to a due process violation . . .

." *Spencer*, 2024 WL 1184714, at *4. Plaintiffs offer conclusory allegations that Officer

Martin destroyed true exculpatory evidence to prove her innocence. (Am. Compl. ¶ 75.)

These allegations lack the factual ingredients necessary to establish that Officer Martin

acted in bad faith when turning off her body camera or inability to produce the footage.

But most detrimental to Plaintiffs' claim is that even if Ms. Kissinger-Stankevitz could sufficiently allege each element of a *Brady*-like § 1983 claim, Ms. Kissinger-Stankevitz has not been charged with a crime in Chesapeake Circuit Court, much less tried and convicted. Plaintiffs' due process challenge for destroying exculpatory evidence cannot be maintained absent a criminal proceeding. And even if Ms. Kissinger-Stankevitz were charged with a crime, the court hearing that case would be the proper forum to litigate any *Brady* violation, not this Court.

Accordingly, Plaintiffs fail to state a claim for a due process violation against Officer Martin and she is entitled to qualified immunity because Plaintiffs fail to allege a constitutional violation.

Consequently, Count II will be dismissed with prejudice as to Officer Martin in her personal capacity and without prejudice as to Officer Martin in her official capacity, dismissed without prejudice as to the Town of Tappahannock, *see supra* Section III.B., and dismissed without prejudice as to CA Donoghue in both capacities, *see supra* Section III.A.

### D. Count III: Violation of Due Process pursuant to § 1983 against Martin, Walsh, and Donoghue

#### i. Failure to State a Claim

Plaintiffs state that Officer Martin, Specialist Walsh, and CA Donoghue "delegitimize[ed] N.B., protect[ed] Bailey from criminal liability and [] attack[ed] [Ms.] Kissinger-Stankevitz without any evidence . . . ." (Am. Compl. ¶ 80). Plaintiffs alleges four bases for their due process claim under § 1983: (1) Defendants deprived Plaintiffs of

a life interest (*id.*); (2) Defendants deprived Plaintiffs of a liberty interest (*id.*); (3) Defendants acted in a way that shocks the conscience (*id.* ¶ 83); and (4) Defendants lacked jurisdiction to investigate Ms. Kissinger-Stankevitz (*id.* ¶ 81). Defendants argue that Plaintiffs fail to state a claim on each allegation and that they are entitled to qualified immunity.

A plaintiff generally cannot prevail on a substantive due process claim without identifying a protected interest in life, liberty, or property that has been violated. *See Hawkins v. Freeman*, 195 F.3d 732, 749 (4th Cir. 1999) (concluding that the assumption that "substantive due process protects against any sufficiently arbitrary act of government, without regard to the existence of any affected liberty interest" is not "valid under contemporary substantive due process jurisprudence."). The Court requires a "'careful description' of the asserted fundamental liberty interest" in substantive due process cases. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

### 1. Plaintiffs Fail to State a Life Interests Claim

The deprivation of life usually requires an individual to have died, or circumstances equivalent to death. *See, e.g., Martinez v. California*, 444 U.S. 277, 283–85 (1980) (taking a life can state a constitutional claim); *Bowring v. Godwin*, 551 F.2d 44, 46–47 (4th Cir. 1977) (refusing to treat life threatening conditions can state a constitutional claim); *Ross v. Cnty. of Lake*, 910 F.2d 1422, 1431 (7th Cir. 1990) (cutting off essential sources of revenue can state a constitutional claim). Plaintiffs have not alleged anyone has died, nor anything closely equivalent.

### 2. Plaintiffs Fail to State a Liberty Interest Claim

The first step of asserting a constitutional injury to one's liberty is to carefully identify what liberty interest is at stake. *Glucksberg*, 521 U.S. at 721. The Supreme Court has recognized many liberty interests over the centuries. *See id.* at 720 (mentioning a long time of cases enshrining the rights to marry, to have children, to martial privacy, to use contraception, to bodily integrity, and to refuse unwanted lifesaving medical treatment). The Fourteenth Amendment's Due Process Clause specifically protects those fundamental rights and liberties which are, objectively, "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022). In analyzing liberty interests, the Court must be "'reluctant' to recognize rights that are not mentioned in the Constitution." *Id.* at 239. Here, Plaintiffs generally assert violations of Plaintiffs' "liberty under the Fourteenth Amendment." (Am. Compl. ¶ 83.) Based on the facts within the Amended Complaint, the Court cannot conclude that Plaintiffs plausibly allege any violation of a liberty interest. And Plaintiffs "provide no textual or historical support" for the Court to find differently. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 862 (1998) (Scalia, J., concurring).

### 3. Plaintiffs Fail to State a Substantive Due Process Claim

Government conduct may constitute a constitutional injury when it rises to a level that "shocks the conscience." *Lewis*, 523 U.S. at 849. "Defining conduct that shocks the conscience does not draw on any traditional standard of liability from tort law but rather refers, as a constitutional construct of substantive due process, to 'conduct intended to

injure in some way unjustifiable by any government interest.'" *Slaughter v. Mayor and City of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012) (quoting *Lewis*, 523 U.S. at 849). Negligently inflicted harm, on the other hand, "is categorically beneath the threshold of constitutional due process." *Washington v. Hous. Auth. of the City of Columbia*, 58 F.3d 170, 178 (4th Cir. 2023) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989)). However, conduct falling between intentional conduct and negligent conduct—deliberate indifference—may give rise to liability under the Fourteenth Amendment. *Id.*

Plaintiffs allege intentional conduct by Defendants: (1) Officer Martin turning off her body camera and admitting to destroying evidence (Am. Compl. ¶¶ 11, 45); (2) Officer Martin testifying before a grand jury as part of her investigation (*id.*); (3) Officer Martin and CA Donoghue generally investigating and conducting surveillance of Ms. Kissinger-Stankevitz (*id.* ¶¶ 12, 58); and (4) Defendants exerting pressure on Essex Department of Social Services to reverse the finding of sexual abuse against Dr. Bailey (*id.* ¶ 57). "While the measure of what is conscience shocking is no calibrated yard stick, it does . . . point the way." *See Lewis*, 523 U.S. at 847 (internal quotations omitted). Here, it is evident Plaintiffs' allegations are not sufficient to demonstrate "outrageous" and "egregious" conduct that shocks the conscience. *See id.* at 847 n.8. Conducting investigations, surveilling suspects, and testifying before grand juries are routine activities of law enforcement officers, and precisely what one expects of law enforcement. And while turning off a body camera may be contrary to policy, doing so in the manner alleged here is not so "outrageous" as to violate the constitution on a

27

shock-the-conscience theory. *See DeShaney*, 489 U.S. at 202 ("[T]he Fourth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation."). Finally, Plaintiffs' allegations that Defendants exerted pressure on the EDSS director are conclusory. Plaintiffs do not provide any facts on how Defendants exerted pressure, what they told the director, or provide further context. Accordingly, the conclusory allegations are insufficient to show any violation of substantive due process.

### 4. Plaintiffs Fail to State a Jurisdiction Claim

Plaintiffs cannot point to any authority suggesting an individual can sue law enforcement officers for investigating beyond their jurisdictional limits. (*See* Pls.' Opp'n to Martin at 20.) Plaintiffs cite to *Tharp v. Commonwealth* for support, a criminal appeal to the Supreme Court of Virginia that never invokes any federal constitutional right. 270 S.E.2d 752, 754 (Va. 1980). If Plaintiffs are charged in Chesapeake Circuit Court, or any other court, they can contest that court's jurisdiction over them, and the jurisdiction of the accusers there. Apart from that occurring, Plaintiffs have no substantive right violated here. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (Scalia, J.).

### ii. Martin and Walsh Immunities

Officer Martin and Specialist Walsh assert they are also entitled to qualified immunity for their conduct.[7] For the reasons previously discussed, none of the conduct

---

[7] Plaintiffs do not appear to dispute that Specialist Walsh could be entitled to qualified immunity based on her position with Essex DSS—a government agency. (*See* Pls.' Mem. in Opp'n to Walsh at 9–10.)

sufficiently establishes "whether a constitutional violation occurred." *See Sharpe*, 59 F.4th at 683. Accordingly, Officer Martin and Specialist Walsh are entitled to qualified immunity.

Additionally, Specialist Walsh, thereby Essex County, is entitled to sovereign immunity for suits against her in her official capacity. "Courts have consistently held that local departments of social services enjoy the protection of sovereign immunity due to the state's high level of control and state law's treatment of the department as an arm of the state." *Rashad v. Jenkins*, No. 3:15-cv-655, 2016 WL 901279, at \*6 (E.D. Va. Mar. 2016) (citing several cases in support). Accordingly, all claims against Specialist Walsh in her official capacity will be dismissed.

Consequently, Count III against Officer Martin and Specialist Walsh in their personal capacities will be dismissed with prejudice and without prejudice for the claims against their official capacities. Count III will also be dismissed without prejudice as to CA Donoghue in both his personal and official capacities. *See supra* Section III.A.

### E. Count IV: Violation of Due Process pursuant to § 1983 against Tappahannock and Donoghue

Plaintiffs also bring a § 1983 claim against CA Donoghue and the Town of Tappahannock for violating Ms. Kissinger-Stankevitz's right to the "companionship, care, custody, and management of her child." (Am. Compl. ¶ 86.) According to the Amended Complaint, the Town is liable because CA Donoghue had "the responsibility and authority to implement final policy for the Town regarding who they prosecute and who they do not." (*Id.* ¶ 85.) As the Court has already discussed, as a constitutional

29

officer CA Donoghue is not the final policymaker for the Town. *See supra* Section III.B.i. As such, the Town cannot be held responsible for any of CA Donoghue's conduct. *See Monell*, 436 U.S. at 694–95. Additionally, Plaintiffs lack standing to challenge any of CA Donoghue's investigative or prosecutorial decisions. *See supra* Section III.A. Consequently, Count IV will be dismissed as to the Town of Tappahannock and CA Donoghue, in both capacities, without prejudice.[8]

**F. Count V: Violation of the Equal Protection Clause pursuant to § 1983 against Martin, Walsh, and Donoghue**

Plaintiffs allege that Officer Martin, Specialist Walsh, and CA Donoghue, "intentionally treated N.B. differently from other similarly situated victims of sexual abuse solely on the basis of his young age in violation of his Fourteenth Amendment right to equal protection of the laws." (Am. Compl. ¶¶ 90–91.) Additionally, Officer Martin "discriminated against [N.B.] by refusing to consider that [N.B.] was telling the truth and by faking an investigation of his father in order to attack his mother providing him protection." *Id.* Defendants contend that Plaintiffs do not plausibly allege constitutional violations and that they are entitled to qualified immunity. (Martin Br. in Supp. at 13.)

The Equal Protection Clause "bars 'any State' from 'deny[ing]' to any person within its jurisdiction the equal protection of the laws.'" *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 878 (4th Cir. 2023) (quoting U.S. Const. amend. XIV, § 1). To

---

[8] Even if the Court were to reach the merits of Plaintiffs' claims, dismissal would be warranted. *See Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (discussing the right to care, control, and management of one's children); *see also Troxel v. Granville*, 530 U.S. 57, 66 (2000) (same).

prevail on an equal protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated" and "the unequal treatment was the result of intentional or purposeful discrimination." *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 82 (2016). If the plaintiff makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id*. Certain classifications such as race, gender, and sex, receive heightened protection. *See Coal. for TJ*, 68 F.4th at 878; *see also Wilcox v. Lyons* 970 F.3d 452, 458 (4th Cir. 2020). Other classifications, such as age, do not. *See Mass. Bd. of Ret. Murgia*, 427 U.S. 307, 313–14 (1976).

Here, Plaintiffs argue that Defendants treated N.B. differently from other similarly situated victims of sexual abuse by "refusing to consider that he was telling the truth and by faking an investigation of his father . . . ." (Am. Compl. ¶ 91.) Despite these allegations, Plaintiffs fail to plead facts showing similarly situated individuals, namely older children recounting sexual abuse, who were treated differently. *See Nofsinger v. Va. Commonwealth Univ.*, No. 3:12–cv–236, 2012 WL 2878608, at *10 (E.D. Va. July 13, 2012), *aff'd*, 523 F. App'x 204 (4th Cir. 2013) (requiring the plaintiff to plead facts showing how her treatment was different from others). Because Plaintiffs fail to show how N.B. was treated differently, the Court need not consider whether there was discriminatory intent.

Defendants are also entitled to qualified immunity. Not only was there no constitutional violation, but it is also not clearly established that investigators violate the Fourteenth Amendment when they weigh a child's age in assessing the credibility of a

sexual abuse report.  Consequently, Count V will be dismissed with prejudice as to

Officer Martin, Specialist Walsh, and CA Donoghue against their personal capacities and

dismissed without prejudice against their official capacities.

### G. Count VI: Common Law Conspiracy against Martin, Walsh, Donoghue, Collier, Dr. Bailey, Mrs. Chiles, and Dr. Chiles

Plaintiffs allege Officer Martin, Specialist Walsh, CA Donoghue, Attorney

Collier, Dr. Bailey, Mrs. Chiles, and Dr. Chiles "reached a meeting of the minds . . .

where they formalized their unlawful scheme." (Am. Compl. at ¶ 96.)  Plaintiffs assert

that Defendants conspired to (1) "cripple [Ms.] Kissinger-Stankevitz mentally and

financially so she would be unable to protect her son," (2) "force N.B. back into the

unsupervised hands of his abuser," (3) "protect [Dr.] Bailey from criminal prosecution,"

and (4)  "destroy[] evidence, generate[] false evidence, provide[] false statements, and

perjury." (*Id.* ¶¶ 94–95.)  According to Plaintiffs, "Defendants additionally furthered

their conspiracy through the intentional torts of tortious interference with parental rights

and intentional infliction of emotional distress." (*Id.* ¶ 95.)  Defendants contend that

Plaintiffs' allegations are conclusory and fail to state a claim.

"Under Virginia law, the elements of a common law civil conspiracy are (i) an

agreement between two or more persons (ii) to accomplish an unlawful purpose or to

accomplish a lawful purpose by unlawful means, which (iii) results in damage to

plaintiff." *William v. AES Corp.*, 28 F. Supp. 3d 553, 574–75 (E.D. Va. 2014) (citing

*Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007)).  Additionally, at least one

member of the conspiracy must commit an "underlying tort" to satisfy the "unlawful"

32

element. *Firestone*, 485 F. Supp. 2d at 703 (quoting *Almy*, 639 S.E.2d at 189). Here,

Plaintiffs fail to successfully allege that any such underlying tort was committed. "To

withstand a motion to dismiss, a plaintiff must 'plead the requisite concert of action and

unity of purpose in more than mere conclusory language.'" *William*, 28 F. Supp. 3d at

574–75 (quoting *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp.

2d 483, 499–500 (E.D. Va. 2003)). "Where there are only vague, conclusory allegations

of conspiracy, the claim fails at the threshold." *Id.* (quoting *Beasley*, 2013 WL 1192018,

at *4).

> A claim of tortious inference with parental rights has four elements:
>
> (1) the complaining parent has a right to establish or maintain a parental or custodial relationship with his/her minor child;
> (2) a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without the parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights;
> (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and
> (4) damages resulted from such interference.

*Padula-Wilson v. Landry*, 841 S.E.2d 864, 869 (Va. 2020). "This claim applies only to

'tortious interference,' which is defined as '[o]ne who, with knowledge that the parent

does not consent, abducts or otherwise compels or induces a minor child to leave a parent

legally entitled to its custody or not to return to the parent after it has been left him, is

subject to liability to the parent." Restatement (Second) of Torts § 700.

Defendants argue that Plaintiffs "fail to plausibly allege that tortious interference with parental rights was the 'unlawful' act in furtherance of an alleged conspiracy." *Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813, 825 (E.D. Va. 2013) (quoting *Hechler Chevrolet, Inc. v. Gen. Motos Corp.*, 337 S.E.2d 744, 748 (Va. 1985)). Importantly, the Amended Complaint never alleges that N.B. was removed from Ms. Kissinger-Stankevitz's care, custody, or control. Plaintiffs counter that removal is not required, only attempted interference with her rights. (*See* Pls.' Resp. in Opp'n to Bailey at 5, ECF No. 82.) While the "otherwise preventing the complaining parent from exercising her parental or custodial rights" may contemplate interference beyond removal, the Amended Complaint is devoid of what that inference could be. The filing of a CHINS petition, or investigation of criminal conduct is certainly not what the Virginia Supreme Court contemplated was encompassed by this right. *See Padula-Wilson*, 841 S.E.2d at 869. To interpret it otherwise would turn every legal avenue into determining the safety of a child into a tortious interference with parental rights. As such, Plaintiffs do not adequately allege sufficient tortious conduct with regard to parental rights.

Similarly, Defendants argue the act of turning off a body camera is not destruction of evidence. (Martin Br. in Supp. at 16.) Conversely, in Plaintiffs' view, "turning off the body cam footage alters, erases, and secretes the recording" which is "part of the record." (Pls.' Resp. in Opp'n to Martin at 4–5.) This interpretation is untenable. A plain reading of the text of Virginia Code § 18.2-472 is clear. An officer may not falsify, destroy, or alter a record. This means there must first be a record and second, actions are taken against it. Here, Plaintiffs plainly allege the absence of a record. That *if* Officer Martin

34

had kept her body camera on, that it would have exculpated her in a criminal proceeding that has not occurred or inculpated Dr. Bailey in a proceeding that has not occurred. (Am. Compl. ¶¶ 44, 61, 75.)   Plaintiffs attempt to avoid this conclusion by citing to a single Fourth Circuit case remarking that an officer's body camera footage was included in the record provided to that court on appeal. (*See* Pls.' Resp. in Opp'n to Bailey at 5.) The Court declines to adopt Plaintiffs' reasoning.

Finally, the Supreme Court of Virginia has refused to recognize a conspiracy to commit IIED. *Almy v. Grisham*, 639 S.E. 2d 182, 189 (Va. 2007) (holding that a plaintiff could not assert a cause of action in Virginia for civil conspiracy to intentionally inflict severe emotional distress).

Plaintiffs' remaining claims center around underlying torts that also fail to state a claim. *See infra* Section III.H. (dismissing business conspiracy to cripple Ms. Kissinger-Stankevitz financially); *infra* Section III.J. (dismissing negligent investigation or prosecution); *infra* Section III.K (dismissing IIED).

Defendants also argue that the Amended Complaint fails to allege he had a "meeting of the minds."   However, given that Plaintiffs fail to state a claim for any underlying tort, the Court need not address Defendants' contentions that there was not a meeting of the minds.  Consequently, Count VI will be dismissed as to each Defendant without prejudice.

**H. Count VII: Business Conspiracy against Martin, Walsh, Donoghue, Collier, Dr. Bailey, Mrs. Chiles, and Dr. Chiles**

In Count VII, Plaintiffs allege that Officer Martin, Specialist Walsh, Donoghue, Attorney Collier, Dr. Bailey, Ms. Chiles, and Dr. Chiles, "conspired to ruin Ms. Kissinger-Stankevitz's reputation in the field of cyber security in order to cripple her financially," violating Virginia Code § 18.2-499 (business conspiracy). (Am. Compl. ¶¶ 98, 102.) Plaintiffs argue Defendants "furthered their business conspiracy . . . through unlawful means by destroying evidence, generating false evidence, providing false statements, and perjury." (*Id.* ¶ 99.) Plaintiffs also contend that Dr. Bailey, Ms. Chiles, and Dr. Chiles's filing of a defamation counterclaim represents the continuing attack "on Ms. Kissinger-Stankevitz's professional reputation tied to her Linked in account." (*Id.* ¶ 101.) Defendants contend that Plaintiffs fail to state a claim for business conspiracy.

Defendants argue that Virginia Code § 18.2-499 "protects business-related interests, not personal reputations and interests." (Martin Br. in Supp. at 18.) And because Plaintiffs allege harm to Ms. Kissinger-Stankevitz's personal and professional reputational interests, not business-related interests, Defendants argue she fails to state a claim.

In Virginia, any two (2) or more persons who mutually agree to work in concert to maliciously injure another's "reputation, trade, business or profession by any means . . ." may be civilly liable under Virginia Code § 18.2-499(A). In addition, Virginia Code § 18.2-500 permits civil actions for "any person who shall be injured in [her] reputation, trade, business, or profession by reason of a violation of § 18.2-499." *Id.* § 18.2-500(A).

36

Virginia law requires evidence that "the defendants have combined . . . to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012). To survive a motion to dismiss, "the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy.'" *Barrett*, 975 F.3d at 434.

Furthermore, a plaintiff must allege harm to an actual business interest, not a personal interest. *See Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 622 (W.D. Va. 2023) ("[Virginia Code § 18.2-499] 'appl[ies] to business and property interests, not to personal or employment interests.'" (citing *Andrew v. Ring*, 585 S.E.2d 780 (2003))). Simply put, "[a]n individual does not have a business interest if 'he neither owned a company, did business as a separate organization, nor had a separate tax identification number for his contractor status." *Shirvinski*, 673 F.3d at 321; *see also Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) ("[A] right of action is 'afforded [under these statutes] only when malicious conduct is directed at one's business, not one's person,' and that the statute 'focuses upon conduct directed at property, i.e. one's business' and applies only to 'conspiracies resulting in business-related damages.'")

Here, Plaintiffs' allegations center around harm to Ms. Kissinger-Stankevitz's "business and professional interests in the field of cyber security." (Am. Compl. ¶ 104; *see also id.* ¶¶ 41, 54, 67.) Ms. Kissinger-Stankevitz recently obtained a degree in cyber security and argues Defendants' conduct has make it difficult for her to obtain "a career in cyber security." (*Id.* ¶¶ 41, 67.) Difficulty in finding employment and obtaining a job does not constitute business interests. *See Cox v. MAG Mut. Ins. Co.*, No. 3:14-cv-377,

2015 WL 1640513, at *2 (E.D. Va. 2015) (finding the plaintiff failed to state a claim alleging only employment interests). While Ms. Kissinger-Stankevitz might have alleged that she suffered injury to her reputation as an independent cyber security contractor, she does not.[9] Therefore, Plaintiffs fail to state a claim and Count VII will be dismissed without prejudice as to each Defendant.

## I. Count VIII: Common Law Conspiracy against Martin and Walsh

Plaintiffs allege that Officer Martin and Specialist Walsh "conspired to commit barratry, criminalized under Virginia Code § 18.2-452 by enticing [Dr.] Bailey to file a frivolous CHINS action seeking to send N.B. to foster care." (Am. Compl. ¶ 106.) Officer Martin and Specialist Walsh allegedly "formalize[d] [this] unlawful scheme" during a June 4, 2021, meeting. (Am. Compl. ¶ 107.)

"[I]n Virginia, a common law claim of civil conspiracy generally requires proof that the underlying tort was committed. *Almy*, 639 S.E.2d at 188. Barratry is "the offense of stirring up litigation" or "instigating or attempting to instigate a person or persons to institute a suit at law or equity." Va. Code Ann. § 18.2-451(a); 18.2-451(c). Barratry is, however, a *criminal* action. *See id.* § 18.2-454 ("Suits to enjoin barratry may be brought by the Attorney General or the attorney for the Commonwealth in the appropriate circuit court."); *id.* § 18.2-452 ("Any person, if an individual, who shall engage in barratry shall be guilty of a Class 1 misdemeanor . . . ."). Here, Plaintiffs must

---

[9] Even if Ms. Kissinger-Stankevitz were to allege that, she would have to support the assertion with evidence, namely, "a separate tax identification number for [her] contractor status." *Shirvinski*, 673 F.3d at 321.

allege a civil conspiracy to commit a tort.  Plaintiffs have alleged no tort.  Additionally, there are no facts to suggest either Defendant paid "all or part of the expenses of the litigation" as would be required.  *See id.* § 18.2-451(d).  Consequently, Count VIII will be dismissed with prejudice as to Officer Martin and Specialist Walsh in their personal capacities and without prejudice for claims against their official capacities.

### J.  Count IX: Negligence against Martin, Walsh, and Donoghue

In Count IX, Plaintiffs allege that Officer Martin, Specialist Walsh, and CA Donoghue were negligent because Defendants (1) had a special relationship with N.B. (Am. Compl. ¶¶ 110–11) (2) that created a duty to protect him from harm and to do what a reasonable person would have done after receiving the disclosures of sexual abuse by Dr. Bailey.  (*Id.*)  Furthermore, Defendants (3) breached this duty by attempting to create false evidence against Ms. Kissinger-Stankevitz and faking an investigation of Dr. Bailey (*id.* ¶ 112), (4) and N.B. suffered as a direct and proximate result.  (*Id.* ¶ 114.) Defendants argue that Plaintiffs fail to state a claim on each allegation and that each Defendant is entitled to sovereign immunity for claims against their personal capacities.[10] (Martin Br. in Supp. at 22–28; Walsh Br. in Supp. at 22–28; Donoghue Br. in Supp. at 10–11).

"[I]ndividuals that work for an immune government entity, such as a sheriff's office, may invoke the Commonwealth's sovereign immunity with respect to claims of simple negligence [in their personal capacity] so long as the challenged conduct consisted

---

[10] While Defendants are entitled to Eleventh Amendment immunity for lawsuits against their official capacities, sovereign immunity grants immunity for lawsuits against Defendants in their personal capacities—yet only for acts of mere negligence.

of 'acts of judgment and discretion which are necessary to the performance of [essential] governmental function[s].'" *Riddick v. Watson*, 503 F. Supp. 3d 399, 425–26 (E.D. Va. 2020) (quoting *Heider v. Clemons*, 400 S.E.2d 190, 191 (Va. 1991)). The Supreme Court of Virginia has established four factors for a court to assess when determining whether conduct constitutes an essential government function to warrant immunity: (1) the function performed by the employee, (2) the extent of the state's interest and involvement in that function, (3) the degree of control and direction the state exercises over the employee, and (4) whether the act performed involves the use of judgment and discretion." *Friday-Spivey v. Collier*, 601 S.E.2d 591, 593, 593 n.4 (Va. 2004); *accord Messina v. Burden*, 321 S.E.2d 657 (Va. 1984). Immunity does not extend to conduct beyond mere negligence. *See James*, 282 S.E.2d 864, 869 (Va. 1980) ("A state employee who acts wantonly, or in a culpable or grossly negligent manner, is not protected.") Thus, the Court will first address whether Defendants' conduct would qualify for sovereign immunity, and subsequently, whether the "Complaint contains sufficient facts that would permit a factfinder to reasonable conclude that the alleged conduct 'extends beyond mere negligence.'" *Riddick*, 503 F. Supp. 3d at 431.

### i. Donoghue's Sovereign Immunity

CA Donoghue is a constitutional officer. *See supra* Section II.B.; Va. Const. art. VII, § 4. Commonwealth's Attorneys are generally afforded immunity based on their proximity to the highest levels of state government. *See Messina*, 321 S.E.2d at 661 ("There is very little debate regarding the extension of the doctrine to those who operate at the highest levels of the three branches of government."); *see also Lloyd v. Morgan*,

4:14-cv-107, 2015 WL 1288346, at *12 (E.D. Va. Mar. 20, 2015) (holding constitutional officer—Sheriff for the City of Newport News—immune). Indeed, CA Donoghue's conduct implicates each *Messina* factor. First, all of CA Donoghue's conduct was in his elected position—not in some separate, off-work, personal capacity. Second, the Commonwealth has a strong interest in the functions and activities of the chief local prosecutors. Third, "the state, through the citizenry, exercises significant control over the sheriff by way of popular election." *See Lloyd*, 2015 WL 1288346, at *13; Va. Const. art. VII, § 4 ("There shall be elected by the qualified voters of each county and city a . . . attorney for the Commonwealth . . . ."). Finally, *how* a case is handled from nascent stages of investigation through trial and appeal is ultimately an exercise of judgment and discretion held by the Commonwealth's Attorney. Accordingly, CA Donoghue is entitled to sovereign immunity for acts of mere negligence.

### iii. Martin and Walsh's Sovereign Immunity

Officer Martin and Specialist Walsh are employees for the Town of Tappahannock and Essex Department of Social Services, respectively. While they are not constitutional officers, the *Messina* factors also favor sovereign immunity. First, conducting investigations of sexual abuse is at the heart of both Officer Martin and Specialist Walsh's positions. And their conduct in question all occurred within those roles. Second, the state has a strong interest in the investigations and accusations of sexual abuse. Third, both individuals are answerable to their supervisors: Officer Martin to the Tappahannock Police Chief and Specialist Walsh to the Essex Social Services Director. Finally, investigations of any sort invariably require exercising judgment and

41

discretion—especially investigations involving child victims. Accordingly, Officer Martin and Specialist Walsh are entitled to sovereign immunity for acts of mere negligence.

### 1. Gross Negligence

In order to allege sufficient facts to establish gross negligence, Plaintiffs must show that Defendants had a duty, and breached that duty beyond mere negligence—i.e., by "showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Cowan v. Hospice Supp. Care, Inc.*, 603 S.E.2d 916, 918–19 (Va 2004). Plaintiffs fail to allege a plausible claim of negligence.

"Negligence . . . is not actionable unless there is a legal duty, a violation of the duty, and consequent damage." *Burns v. Gagnon*, 727 S.E.2d 634, 641 (Va. 2012) (quoting *Marshall v. Winston*, 389 S.E.2d 902, 904 (Va. 1990)). The allegation that a duty existed is a legal conclusion that is not presumed to be true at the motion to dismiss stage. *See Iqbal*, 556 U.S. at 678. "The complaint must include factual statements that sufficiently support the existence of the duty that the defendant owed to the plaintiff." *Wenzel v. Knight*, No. 3:14–cv–432, 2015 WL 3466863, at *12 (E.D. Va. 2015).

"[G]enerally a person does not have a duty to protect another from the conduct of third persons." *Burns*, 727 S.E.2d at 641 (citing *Kellermann v. McDonough*, 684 S.E.2d 786, 793 (Va. 2009)). There are two (2) exceptions to this rule. First, "where a defendant expressly assumes a duty to protect another from criminal harm." *Terry v. Irish Fleet, Inc.*, 818 S.E.2d 788, 793 (Va. 2018). Second, where "a special relation

42

exists (1) between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct, or (2) between the defendant and the plaintiff which gives a right to protection to the plaintiff." *Burns*, 727 S.E.2d at 669 (citing *Burdette v. Marks*, 421 S.E.2d 419, 420 (Va. 1992)).

"Examples of special relationships [the Supreme Court of Virginia has] recognized between a defendant and a plaintiff include common carrier-passenger, business proprietor-invitee, innkeeper-guest, and employer-employee with regard to the employer's potential duty of protecting or warning an employee." *Kellerman*, 684 S.E.2d at 793. The Court has "exercised caution in expanding [the list] to include new relationships." *Burns*, 727 S.E.2d at 642. The Supreme Court of Virginia has been reluctant to recognize a duty "where a public official is being sued for acts committed in [her] official capacity," because "it is not in society's best interest to subject public officials to potential liability for every action undertaken." *Burns*, 727 S.E.2d at 643.

Plaintiffs argue that Defendants each had a special relationship with N.B. giving rise to a duty to protect him from harm. (Am. Compl. ¶ 110.) Plaintiffs draw this special relationship from the Supreme Court of Virginia's decision in *Burdette v. Marks*. *See* 421 S.E.2d 419 (Va. 1992); (Pls.' Resp. in Opp'n to Donoghue Mot. 12(b)(6) at 9, ECF No. 84). Plaintiffs contend that Defendants each had a special relationship with N.B. because they know N.B. was in danger of serious bodily harm in the form of sexual abuse from Dr. Bailey. (*Id.*) Plaintiffs posit that Virginia Code § 15.2-1704 and § 63.2-1503 establish the duties Defendants breached. (*See* Pls.' Resp. in Opp'n to Walsh at 13, ECF No. 80; Pls.' Resp. in Opp'n to Martin at 3.) Ultimately Plaintiffs allege Defendants put

43

N.B. in danger by conducting a negligent and sham investigation. (*See* Pls.' Resp. in Opp'n to Walsh at 14.)

Defendant's relationship with N.B. does not rise to the same level as those relationships recognized by the Supreme Court of Virginia. *See Kellermann*, 684 S.E.2d at 793. Defendants investigated the allegations against Dr. Bailey, and during that investigation, they conducted a forensic interview of N.B. (Am. Compl. ¶ 34.) Ms. Kissinger-Stankevitz never "relinquishe[d] the supervision and care of [her] child" and Defendants never assumed a duty to provide for N.B.'s safety or wellbeing. *See Nelson v. Green*, 965 F. Supp. 2d 732, 757 (W.D. Va. 2013). The relationship was nothing beyond the everyday formal relationship between investigator and witness—not rising to the "high hurdle" the Supreme Court of Virginia has required. *See Sage v. United States*, 974 F. Supp. 851, 860 (E.D. Va. 1997) (citing *Fox v. Custis*, 372 S.E.2d 373, 376 (Va. 1988)).

Additionally, courts have routinely recognized that there is no cause of action for negligent investigations. *See Lewis v. McDorman*, 820 F. Supp. 1001, 1008 (W.D. Va. 1992), *aff'd*, 28 F.3d 1210. Recently, the Fourth Circuit held that whether Virginia recognizes a cause of action for negligent investigations was an open question of Virginia law and declined to exercise supplemental jurisdiction over the claim. *See Safar v. Tingle*, 859 F.3d 241, 251 (4th Cir. 2017) ("But given the dearth of state law on negligent investigations, we think the definition of legal duties under the law of tort is best left for the state courts to resolve."). While the resolution of *Safar* on remand is unclear, as least one Virginia circuit court has since held that Virginia does *not* recognize a cause of

action for negligent investigation or incorrect initiation of criminal process. *See Small v. Tate*, No. CL-18-04051, 2019 WL 4239438, at *2 (Va. Cir. Ct. June 19, 2019). Indeed, while the statutes Plaintiffs cite to establish the duties and responsibilities of DSS specialists and police officers, they do not *create* a cause of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) (Scalia, J.) ("Without [statutory intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as policy matter, or how compatible with the statute."). Accordingly, the claim for negligence based on Defendants' investigations cannot be maintained, and no special relationship exists to impose any such duty. Additionally, since Plaintiffs cannot plausibly allege gross negligence, Defendants are entitled to qualified immunity.

Consequently, Count IX against Officer Martin, Specialist Walsh, and CA Donoghue in their personal capacities will be dismissed with prejudice and without prejudice for claims against their official capacities.

### K. Count X: Intentional Infliction of Emotional Distress ("IIED") against Martin, Walsh, Donoghue, Collier, Dr. Bailey, Mrs. Chiles, and Dr. Chiles

Plaintiffs allege that Officer Martin, Specialist Walsh, CA Donoghue, Attorney Collier, Dr. Bailey, Mrs. Chiles, and Dr. Chiles "intentionally took action to discredit N.B. by attacking Ms. Kissinger-Stankevitz through destroying evidence, generating false evidence, lying to federal and state agencies, lying in court and faking an investigation." (Am. Compl. ¶ 116.) Defendants argue that Plaintiffs fail to state a claim on each allegation.

45

Intentional Infliction of Emotional Distress requires four (4) elements: "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; (4) and the resulting emotional distress was severe." *Almy*, 639 S.E.2d at 186. However, "the tort of intentional infliction of emotional distress is 'not favored' in the law, because there are inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury." *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 370 (Va. 2008). Though federal courts do not apply the heightened standard of Virginia courts, they must still be cognizant that not all "insensitive and demeaning" conduct is "utterly intolerable." *See Williams v. Agency, Inc.*, 997 F. Supp. 2d 409, 414 (E.D. Va. 2014).

Under the first prong, the defendant must have intended to cause the plaintiff severe emotional distress or must have acted recklessly. *See id.* at 187. Recklessly means whether the defendant "knew or should have known" that the alleged conduct would cause the plaintiff severe emotional distress. *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 759 (E.D. Va. 2016) (quoting *Almy*, 639 S.E.2d at 187).

Conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991). "[N]either tortious intent, criminal intent, malicious intent, nor conduct worthy of punitive damages is sufficient to fulfill the 'outrageous' element of an intentional infliction of emotional distress claim." *Daniczek*, 156 F. Supp. 3d at 759-60.

The emotional distress must also be "extreme" and "so severe that no reasonable person could be expected to endure it." *Id.* (quoting *Russo*, 400 S.E.2d at 162). Allegations that a plaintiff "was nervous, could not sleep, experienced stress and its physical symptoms, withdrew from activities, and was unable to concentrate at work" are insufficient to plausibly allege a claim of IIED. *Id.* (quoting *Russo*, 400 S.E.2d at 163).

Thus, for the Court to permit Plaintiffs' claim, the Court must look to the conduct of each Defendant and assess whether a reasonable jury could view their conduct as outrageous. However, Plaintiffs cannot rely on conclusory allegations for support. "Where reasonable men may differ, it is for the jury . . . to determine whether . . . the conduct has been sufficiently extreme and outrageous to result in liability." *Stover v. Coll. of William & Mary*, 635 F. Supp. 3d 429, 445 (E.D. Va. 2022) (citing *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974)). Here, Plaintiffs allege (1) that Officer Martin provided false information and suppressed body camera footage by turning it off (Am. Compl. ¶¶ 44, 57, 116); (2) that Specialist Walsh provided false information to the Essex DSS director (*id.* ¶ 57); (3) that CA Donoghue, Dr. Bailey, Mrs. Chiles, and Dr. Chiles conspired to cause N.B. harm through their complicity in the destruction of evidence and the creation of false evidence (Pls.' Resp. in Opp'n to Donoghue 12(b)(6) at 2; Pls.' Resp. in Opp'n to Bailey at 2); (4) and that Mr. Collier made false statements to the circuit court (Am. Compl. ¶¶ 7, 62, 64).

These allegations do not plausibly show outrageous conduct. First, Plaintiffs' claims that Defendants spread false information about them is, if true, is entirely unacceptable. Yet, while these statements may be defamatory, they are not outrageous

and "beyond all possible bounds of decency." *See Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 265 (W.D. Va. 2001) (holding false statements intending to destroy the plaintiff's reputation in the community were not sufficient for IIED claim); *see also Fields v. Spirit Corp.*, No. 3:16-cv-905, 2017 WL 4053761, at *3 (E.D. Va. May 11, 2017) ("Indeed, 'neither tortious intent, criminal intent, malicious intent, nor conduct worthy punitive damages' will suffice to fulfill the outrageousness element of an IIED claim." (citing *Daniczek*, 156 F. Supp. 3d at 759-60)), *report and recommendation adopted*, 2017 WL 4052380 (E.D. Va. Sept. 12, 2017). Second, the charges of destroying evidence center around Officer Martin's decision to *turn off* her body camera. (Am. Compl. ¶ 76.) The act of turning off a body camera before or during a discussion with a witness cannot be held to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Daniczek*, 156 F. Supp. 3d at 760. Seldom is the outrageous prong of IIED satisfied, and Plaintiffs here fall short as well. *See Fields*, 2017 WL 4053761, at *4 (discussing examples of alleged IIED conduct that was not outrageous to survive a motion to dismiss). Consequently, Count X will be dismissed without prejudice as to each Defendant.

## IV. COUNTERCLAIM BACKGROUND

Beginning in January 2016, Ms. Kissinger-Stankevitz "commenced a campaign of making malicious and false claims that Dr. Bailey sexually abuse E.T." (Countercl. ¶ 23.) These allegations of sexual abuse of E.T. were determined to be unfounded. (*Id.* ¶ 25.) Ultimately, Dr. Bailey and Ms. Kissinger-Stankevitz legally divorced on

48

October 23, 2020, and Dr. Bailey received joint custody of N.B. with unrestricted visitation rights. (*Id.* ¶¶ 26–28.)

In May 2021, Ms. Kissinger-Stankevitz allegedly made another set of false and malicious allegations that Dr. Bailey sexually abused N.B. (*Id.* ¶¶ 29, 50–55.) Counterclaim Plaintiffs Dr. Bailey, Mrs. Chiles, and Dr. Chiles (collectively, "Counterclaim Plaintiffs") assert that Ms. Kissinger-Stankevitz coached N.B. to make a false complaint of sexual abuse to a CHKD nurse. (*Id.* ¶¶ 33–34.) EDSS conducted a nearly year-long investigation, and on August 6, 2021, EDSS "entered an 'unfounded' determination." (*Id.* ¶ 35.) However, due to alleged pressure and complaints from Ms. Kissinger-Stankevitz, EDSS reopened the investigation and entered a "founded" determination on December 27, 2021. (*Id.*) Dr. Bailey appealed the "founded" decision, and EDSS Director Mickelborough determined that there was insufficient evidence to support a "founded" disposition and "overturn[ed] the agency's finding of Founded Level I, Sexual abuse, of N.B. by [Dr.] Bailey." (*Id.* ¶¶ 35–42.)

On May 7, 2021, one day after filing her complaint with EDSS, Ms. Kissinger-Stankevitz sought an Emergency Protective Order from the Chesapeake Juvenile and Domestic Relations Court based on the false allegations that Dr. Bailey sexually abused N.B. (*Id.* ¶¶ 50–51.) This false allegation resulted in the court entering an Emergency Protective Order prohibiting Dr. Bailey from contacting N.B. (*Id.* ¶ 52.) The Protective Order was terminated on October 6, 2022, and one week later, on October 13, 2022, Ms. Kissinger-Stankevitz "obtained, on virtually identical baseless grounds, an *ex parte* protective order from a court in North Carolina." (*Id.* ¶¶ 56–57.) Due to this protective

49

order, Dr. Bailey has been unable to visit or communicate with his son, N.B, for two (2) years. (*Id.* ¶ 57.)

On May 25, 2021, Ms. Kissinger-Stankevitz and Mr. Stankevitz arrived at EDSS for an interview of Ms. Kissinger-Stankevitz. (*Id.* ¶ 43.) When Mr. Stankevitz was informed that he was unable to be present during the interview, Ms. Kissinger-Stankevitz and Mr. Stankevitz caused a scene at EDSS before leaving. (*Id.* ¶¶ 43–45.) Ms. Kissinger-Stankevitz and Mr. Stankevitz then attempted to convince CA Donoghue to bring criminal charges against Dr. Bailey. (*Id.* ¶¶ 45–46.) CA Donoghue informed them that, in order to pursue criminal charges, they must comply with EDSS. (*Id.*) CA Donoghue ultimately declined to press criminal charges against Dr. Bailey, stating that N.B. appeared to be coached and, instead, began investigating Ms. Kissinger-Stankevitz for "witness tampering related charges." (*Id.* ¶ 47.)

On July 26, 2021, Ms. Kissinger-Stankevitz filed a false sexual offense complaint with York-Poquoson Sheriff's Office ("York-Poquoson"), "alleging that Dr. Bailey had sexually assaulted his son, N.B., and forced him to watch pornographic videos." (*Id.* ¶ 58.) York-Poquoson was unable to substantiate Ms. Kissinger-Stankevitz's claims and contacted the Tappahannock Police Department regarding the complaint. (*Id.* ¶¶ 59–60.) Officer Martin informed them that the Tappahannock Police Department had already investigated Ms. Kissinger-Stankevitz's complaint and determined that the allegations against Dr. Bailey were unfounded. (*Id.* ¶ 60.) York-Poquoson ultimately concluded there was no evidence substantiating Ms. Kissinger-Stankevitz's claims and closed the case as "unfounded." (*Id.* ¶¶ 61–62.)

Also on July 26, 2021, Ms. Kissinger-Stankevitz filed the same false sexual

assault complaint of N.B. with the Newport News Police Department ("Newport News").

(*Id.* ¶ 64.) Newport News investigated the claim and found that Ms. Kissinger-Stankevitz

had coached N.B. and filed the report in an attempt to gain leverage in her custody battle.

(*Id.* ¶¶ 65–69.) On August 11, 2021, Newport News closed the case as "unfounded." (*Id.*

¶ 70.)

Ms. Kissinger-Stankevitz also filed a sexual abuse complaint with Maryland's

Department of Health and Human Services ("Maryland DHHS"). (*Id.* ¶ 72.) Maryland

DHHS opened a Child Protective Services ("CPS") investigation into Dr. Bailey. (*Id.*

¶ 73.) On February 1, 2022, Maryland DHHS completed and closed its CPS

investigation based on "a finding that the allegation that Dr. Bailey sexually abused N.B.

was ruled out." (*Id.* ¶ 75.)

Additionally, Ms. Kissinger-Stankevitz routinely posted "that Dr. Bailey is a

'child molester,' a 'serial predator,' and a 'pedophile'" on her public LinkedIn and

Facebook accounts. (*Id.* ¶¶ 77–78.) She also published allegedly defamatory statements

about Mrs. Chiles and Dr. Chiles on her social media accounts. (*Id.* ¶ 80.) Specifically,

Ms. Kissinger-Stankevitz published the following sixteen (16) separate statements about

Dr. Bailey, Dr. Chiles, and/or Mrs. Chiles:

- Publication 1: Video posted on her Facebook account on September 14, 2022:

  Commonwealth of Virginia "We knew a long time ago about the error"
  (perjury) In Social workers Testimony. Who knew: Chesapeake Police
  Department Chesapeake City Attorney Chesapeake Commonwealth of
  Virginia (The Perjury Occurred during Virginia State Bar investigation into
  witness tampering and bribery r [sic] that **child's sexual abuse by Mary**

**Chiles** and **David Bailey** That was disclosed in a forensic interview) The VSbar validated Amy Kissinger's Complaint against Mary Chiles and David Bailey[.]

(*Id.* ¶ 83 (quoting Ex. L, ECF No. 16-12) (emphasis in original)[11].)

- Publication 2: Statement posted on her LinkedIn account between December 21–25, 2022:

Foster care-- **the pedophile has requested our son be placed in the sex trafficking targeted foster care system because he disclosed his father was sexually molesting him.** Last minute yesterday **David** filed some horse crap objection to me having my sons forensic interview to use in court as testimony for a protective order for the kid. **The man should have had all his devices seized in 2020 when he admitted under oath my son was correct that he watched pornography with his dad in their bedroom at his grandparents apartment.** The cop took the devices and then for some reason halted searching **Davids** vehicle. They handed all of the devices back and then lied that forensics was done.

(*Id.* ¶ 87 (quoting Ex. M, ECF No. 16-13) (emphasis in original).)

- Publication 3: Statement posted on her LinkedIn account between December 21–25, 2022:

**Don't tell me Tappahannock Police that** Davids **bestiality orders while he was a LT CDR in the Navy as a doctor . . . has nothing to do with** his serial child sex abuse **that Chesapeake Social services lied about to Chesapeake Circuit Court . . . . David has ordered sick cyber streaming of voyeur rape of kids.**

(*Id.* ¶ 91 (quoting Ex. N, ECF No. 16-14) (emphasis in original).)

- Publication 4: Statement posted on her LinkedIn account around December 26, 2022:

. . . **witness tampering for child sex abuse (the acts disclosed were oral, hand, and finger in my daughters rectum) death threats validated by the Navy, spousal abuse with DOD transitional compensation** and my other child was too terrified to tell me he was being sexually abused by his father.

---

[11] The Court includes the emphasis contained within the Counterclaim. The publications themselves do not contain such emphasis.

I have a video of my son kicking me because I tried to get him to go to visitation that day. **This man orders violent child rape movies and books (Amazon receipts) and voyeur porn, international porn and has admitted the child was [sic] porn with him . . . [.]**

(*Id.* ¶ 95 (quoting Ex. O, ECF No. 16-15) (emphasis in original).)

- Publication 5: Statement posted on her LinkedIn account around December 27, 2022:

    **Let me ask you Virginia Law Enforcement...is anyone "coaching" <u>David Bailey</u> to order voyeur porn after a voyeurism conviction?**
    **Is anyone "coaching" <u>David Bailey</u> to order cyber streaming child rape by a voyeur in books for entertainment after his voyeurism plea deal?**
    **Is anyone "coaching" <u>David</u> to double book Virginia hotels?**
    **Is anyone "coaching" <u>David</u> to switch rental cars?**
    . . .
    **Is anyone "coaching" that <u>serial predator</u> to <u>target a very small town for child sex crimes</u> during a Virginia State Bar investigation?**
    **Is anyone "coaching" <u>him</u> to order a book about a <u>serial rapist</u> in a small Town who gets away with crimes on his Amazon account?**

(*Id.* ¶ 100 (quoting Ex. P, ECF No. 16-16) (emphasis in original).)

- Publication 6: Statement posted on her LinkedIn account around January 4, 2023:

    June 4, 2021 **serial pedophile** in a Police "interrogation" tells social services worker and cop in Tappahannock he is going to sobpoena [sic] them . . . . In voyeurism criminal offense treatment, he's ordering international porn and voyeur porn and **Amazon orders for cyber child rape streaming** . . . . []
    His **sex offender treatment** was at unethical attorneys husbands partner . . . .

(*Id.* ¶ 104 (quoting Ex. Q, ECF No. 16-17) (emphasis in original).)

- Publication 7: Statement posted on her LinkedIn account around January 5, 2023:

    Tappahannock Virginia Police Interrogation. Essex County Virginia Social Worker is running the police investigation and recommending firing an attorney says she has some names of attorneys **the child molester** can use to get rid of protection for the child during a criminal investigation . . . . This Richmond **pedophile** defense attorney mocks a law firm in a police interrogation and says that attorneys recommendations don't make sense.

(*Id.* ¶ 110 (quoting Ex. R, ECF No. 16-18) (emphasis in original).)

- Publication 8: Statement posted on her LinkedIn account around January 5, 2023:

  Tappahannock Virginia social services asking **the pedophile** if he can fire his attorney . . . . Why does she have a list of attorneys for **a child molester** to hire? The attorney he hired I believe was totally unaware he was being hired by this criminal . . . . The Chesapeake PD relied on the Chesapeake social services who lied in court and **covered up the child's abuse by this predator** . . . .

(*Id.* ¶ 115 (quoting Ex. S, ECF No. 16-19) (emphasis in original).)

- Publication 9: Statement posted on her Facebook account around February 3, 2023:

  **While other males go to prison for less, this child sex offenders mother pays to keep her son out of prison. He is a voyeur . . . and has molested 2 children. He befriended a small town cop and social worker to escape jail.**

(*Id.* ¶ 121 (quoting Ex. T, ECF No. 16-20) (emphasis in original).)

- Publication 10: Statement posted on her LinkedIn account around February 6, 2023:

  My child screaming and running to escape visitation to Tappahannock Virginia **with his pedophile father** . . . . Officer Olivia Hurd and Deanne Walsh have **worked to protect David Bailey from being prosecuted**. Deanne Walsh is on Chesapeake court house footage **laughing with the pedophiles mother, Mary Chiles** . . . .

(*Id.* ¶ 126 (quoting Ex. U, ECF No. 16-21) (emphasis in original).)

- Publication 11: Statement posted on her LinkedIn account around February 7, 2023:

  Vince Donohue gave his ok for **David Bailey** to receive special treatment **in his police interrogation for child sex abuse crimes** . . . He also knows **David** violated a safety plan in his town and **snuck off with the child to a hotel**. Officer Olivia Hurd claims she has photos of **David in a hotel with the child**. There are no cameras in the bathroom with the child **in bathrooms alone where my son was molested**.

(*Id.* ¶ 132 (quoting Ex. V, ECF No. 16-22) (emphasis in original).)

- Publication 12: Statement posted on her LinkedIn account around February 19, 2023:

  I was arrested and jailed **by my kids sex offender** . . . . If you speak out against corruption that helps **pedophiles**, you will be retaliated against.

(*Id.* ¶ 136 (quoting Ex. W, ECF No. 16-23) (emphasis in original).)

- Publication 13: Statement posted on her LinkedIn account around February 25, 2023:

  **This is all the places my child was secreted to across Virginia and outside Virginia by a child molester on visitation** . . . . I don't know all the details of what kind of **sex offenses actually occurred** because that was disclosed in a forensic interview conducted by the FBI . . . . All I know is that Tappahannock Virginia police refuse to provide me with the **photos of of** [sic] **David in a hotel with my child.**

(*Id.* ¶ 140 (quoting Ex. X, ECF No. 16-24) (emphasis in original).)

- Publication 14: Statement posted on her LinkedIn account around February 3, 2023:

  **David Bailey is a convicted sex offender and** child molester **hiding a camera on his victims**

  1. He has continued to order voyeurism porn after engaging with a plea deal that left out the victim
  2. **He has ordered child rape movies** and books
  3. He chose to claim he resides in a location of Tappahannock Virginia that a VCU professor was busted for online solicitation for children ages 8,9 for incest rape
  4. **He hired a founded unethical attorney to witness tamper and bribe for these offenses and child molestation**
  5. **He has yet to be held accountable for his sex crime la** [sic] **against children**
  6. **He has befriended a local cop and Social worker in Tappahannock Virginia to avoid prosecution**
  7. He switches around the hotels to live and doucbie [sic] books
  8. He uses rental cars
  9. He has attempted suicide in 2018 and **is mentally unstable**

<sup>12</sup> . . .

11. **He has physically assaulted a child he has sexually abused** and there
is physical evidence and photos
12. **He lied in his police interrogation**
13. **He threatened to kill the child he abused**

. . .

(*Id.* ¶ 144 (quoting Ex. Y, ECF No. 16-25) (emphasis in original).)

- Publication 15: Statement posted on her Facebook account around February 7,
  2023:

  Judson Collier is the attorney I posed who has presented false statements in
  Chesapeake court about the Tappahannock interrogation that **Mary and
  Jack Chiles, the accomplices to sex abuse** were not at David's
  interrogation.

(*Id.* ¶ 148 (quoting Ex. Z, ECF No. 16-26) (emphasis in original).)

- Publication 16: Statement posted on her Facebook account around February 6,
  2023:

  **Mary Chiles, child sex abuse accomplice** admitting that the child was at a
  hotel to Olivia Hurds face on camera.

(*Id.* ¶ 152 (quoting Ex. AA, ECF No. 16-27) (emphasis in original).)

On October 3, 2022, Mr. Stankevitz, Ms. Kissinger-Stankevitz's current husband,

sent a letter to Dr. Bailey's employer, Signify Health (the "Letter"). (*Id.* ¶¶ 156–59; *see*

Ex. BB, ECF No. 16-28.)  Mr. Stankevitz signed the Letter under the title "Security and

Forensics Professional."  (Countercl. ¶ 158 (quoting Ex. BB).)  In the Letter, Mr.

Stankevitz asserts that Dr. Bailey "may have omitted material facts during [his]

---

<sup>12</sup> Counterclaim Plaintiffs included redacted versions of Counterclaim Defendants' allegedly
defamatory statements.  The Court uses ellipses to indicate omissions from those redactions.

background check and hiring process." (*Id.* ¶ 160 (quoting Ex. BB).)  Mr. Stankevitz

further states that:

> **David F. Bailey** has a <u>**criminal and civil abuse history**</u> that includes:

> - **North Carolina founded sexual abuse of 11-year-old girl**
> - **Virginia CPS founded sexual abuse of 8-year-old boy**
> - **Multiple court issued protective orders for spousal and child abuse**
> . . .
> - **Warrant for his arrest**
> - **Multiple purchases of international porn for which the content is illegal in the United States.**

> **Documents included substantiate this history. It is believed that <u>David F. Bailey represents a Danger to Society and as a medical care employer you should be aware of his history and ongoing criminal investigations</u>. Multiple lawsuits are underway due to the severity of the damages that David F. Bailey has inflicted on both children and adults. <u>Please take appropriate actions to protect potential victims from this voyeur and pedophile.</u>**

(*Id.* ¶¶ 161, 163 (quoting Ex. BB) (emphasis in original).)  The Letter also includes a list

of the reports and allegations that Ms. Kissinger-Stankevitz has made against Dr. Bailey.

(*Id.* ¶¶ 162, 166–68.)  Upon receipt of the Letter, "Signify Health placed Dr. Bailey on

leave for several weeks" and Dr. Bailey asserts that "[his] professional reputation was

severely damaged" by the Letter.  (*Id.* ¶¶ 171–72.)

## V. MOTION TO DISMISS THE COUNTERCLAIM

### A. Counts I–VI: Defamation Claims

Counterclaim Defendants Ms. Kissinger-Stankevitz and Mr. Stankevitz

(collectively, "Counterclaim Defendants") argue that Counts I–VI of the Counterclaim

fail to state a claim for defamation.  Specifically, they argue that Counterclaim Plaintiffs

do not sufficiently allege that the purportedly defamatory statements were actionable.

(Countercl. Defs.' Mem. in Supp. at 4–5, ECF No. 24; Countercl. Defs.' Reply at 1–4, ECF No. 27.) Counterclaim Defendants' argument primarily hinges on the assertion that the contents of the allegedly defamatory statements are substantially true. (Countercl. Defs.' Mem. in Supp. at 4–5.) Counterclaim Defendants do not dispute that Counterclaim Plaintiffs alleged sufficient facts to show the requisite intent for a defamation claim and that the allegedly defamatory statements were published.

Counterclaim Plaintiffs argue the Counterclaim sufficiently makes the factual allegation that the publications in question contain demonstrably false statements of fact, and the Counterclaim is sufficiently specific as to the actionable portion of each statement. (Countercl. Pls.' Mem. in Opp'n at 2–4, ECF No. 26.) Counterclaim Plaintiffs further assert that arguments about the truth of the allegedly defamatory statements are improper because at this stage a court must accept the claim that the alleged defamatory statements are false. (*Id.* at 5.)

In Virginia, for a plaintiff to state a claim for defamation, he must allege facts that show (1) the publication of (2) a false defamatory statement with (3) the requisite intent. *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015) (quoting *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013) (internal quotations omitted)); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). The element of publication is satisfied if the defamatory statement is "communicated to a third party 'so as to be heard and understood by such person.'" *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 915 (E.D. Va. 2004) (quoting *Thalhimer Bros. v. Shaw*, 159 S.E. 87, 90 (Va. 1931)). On a

motion to dismiss, the court must credit the plaintiff's allegation of falsity. *Id.* (citing *Conley v. Gibson*, 355 U.S. 41 (1957)).

In Virginia, a defamatory statement is one that "tend[s] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* (internal quotation omitted). Alternatively, certain types of statements are actionable *per se* under Virginia law. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 330–31 (4th Cir. 2005). These include (1) "statements that 'impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished'"; (2) statements declaring that a person has a contagious disease that would cause the person's exclusion from society; (3) statements imputing a person's unfitness to perform the duties of an office or lack of integrity to perform the duties of an office; and (4) statements prejudicing a person in his employment or trade. *Id.* (quoting *Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588, 591 (Va. 1954)); *see also Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1558 (4th Cir. 1994) (holding that accusations of child sexual abuse "are so obviously and materially harmful to reputational interests that they must be deemed defamatory *per se*").

When the plaintiff in a defamation action is a private citizen, the intent element is satisfied if the defendant "either knew [the statement] to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *Ransome v. O'Bier*, No. 3:16-cv-1002,

2017 WL 1437100, at *4 (E.D. Va. Apr. 20, 2017) (quoting *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 725 (Va. 1985)).

Here, Counterclaim Defendants' argument that the allegedly defamatory statements are substantially true and thereby not actionable is improper because Counterclaim Plaintiffs adequately allege that each statement is substantially false, and the Court must credit such an allegation at the motion to dismiss stage. *See Chapin*, 993 F.2d at 1092.

### i. Counts I and II—Publications 1–14

In Counts I and II, Counterclaim Plaintiffs have alleged that Publications 1–14 were each posted on Ms. Kissinger-Stankevitz's public social media pages, where they were viewable by third parties, and in some cases, where third parties interacted with the online posts.[13] (Countercl. ¶¶ 30, 109, 120, 131.) Consequently, Counterclaim Plaintiffs show that Publications 1–14 were published. *See Katz*, 332 F. Supp. at 915. Furthermore, Publications 1–14 constitute defamation *per se* because they state that Dr. Bailey has committed sexual crimes against children, which are criminal offenses involving moral turpitude, and they state that Dr. Bailey is a pedophile and child molester, which prejudices Dr. Bailey in his trade as a medical doctor. (Countercl. ¶¶ 83, 87, 91, 95, 100, 104, 110, 115, 121, 126, 136, 140, 144); *see Hatfill*, 416 F.3d at 330–31; *see also Foretich*, 37 F.3d at 1558. Similarly, Dr. Bailey has alleged facts to show that Publications 1–14 are plausibly actionable because they are likely to harm his reputation

---

[13] The Court may consider documents that are integral to the Complaint and whose authenticity is not in dispute. *Goines*, 822 F.3d at 166. Accordingly, the Court will consider the publications attached to the Counterclaim.

in the manner contemplated by Virginia common law defamation.  (Countercl. ¶¶ 83, 87,

91, 95, 100, 104, 110, 115, 121, 126, 136, 140, 144); *see Chapin*, 993 F.2d at 1092.

Counterclaim Plaintiffs have also alleged facts to show that Ms. Kissinger-Stankevitz

promulgated her claims of sexual abuse despite knowing that each allegation against Dr.

Bailey resulted in a "unfounded" determination by Social Services.  (*See* Countercl. ¶ 7;

*see also* Am. Compl. ¶ 57); *see Ransome*, 2017 WL 1437100, at *4.  Thus, Counterclaim

Plaintiffs have alleged sufficient facts to plausibly state a claim under Counts I and II

with respect to Publications 1–14.

### ii. Counts III and IV—Letter to Signify Health

Counts III and IV plausibly establish a letter Mr. Stankevitz sent to Dr. Bailey's

employer was received and viewed.  (Countercl. ¶¶ 156–57, 171, 201, 216); *see Katz*, 332

F. Supp. at 915.  The Letter, which is described in and attached to the Counterclaim,

imputes to Dr. Bailey a "criminal and civil abuse history" and accuses him of sexual

crimes against children.  (Countercl. ¶¶ 199–200; Ex. BB.)  This allegation plausibly

shows that the contents of the publication were actionable *per se* because they imputed to

Dr. Bailey severe criminal conduct involving moral turpitude, unfitness to perform his

trade as a medical doctor, and they prejudiced Dr. Bailey in his profession.  (Countercl.

¶¶ 208–10; Ex. BB); *see Hatfill*, 416 F.3d at 330–31.  Dr. Bailey has also alleged

sufficient facts to show that the statements in the Letter had the necessary defamatory

sting to meet the common law actionability requirement because of the repugnant

conduct it imputes to Dr. Bailey.  (Countercl. ¶¶ 211, 215); *see Chapin*, 993 F.2d at 1092.

Finally, the Counterclaim alleges facts to show—and Counterclaim Defendants do not

dispute—that Mr. Stankevitz possessed the requisite intent.  (Countercl. ¶¶ 206–06, 219–22); *see Ransome*, 2017 WL 1437100, at \*4.  However, Counterclaim Plaintiffs have not sufficiently alleged that Ms. Kissinger-Stankevitz was involved in sending the Letter.

The Counterclaim contains only conclusory statements that she was involved but provides no facts upon which the Court could conclude that she was responsible for making the defamatory statements, and, significantly, the Letter contains only Mr. Stankevitz's name and signature.  (Countercl. Ex. BB at 1; ECF No. 16-28; *see* Countercl. ¶¶ 198–223.)  Consequently, Counterclaim Plaintiffs have stated a claim for Counts III and IV with respect only to Counterclaim Defendant Mr. Stankevitz.  Counts III and IV against Ms. Kissinger-Stankevitz will be dismissed without prejudice.  The Court grants Counterclaim Plaintiffs leave to amend the Counterclaim, if Counterclaim Plaintiffs can allege additional facts that show Ms. Kissinger-Stankevitz's responsibility for the allegedly defamatory conduct.

### iii.  Counts V and VI—Publications 1, 15, and 16

Counts V and VI involve Publications 1, 15, and 16, which were allegedly published on Ms. Kissinger-Stankevitz's social media pages.  (Countercl. ¶¶ 83, 148, 152, 225.)  Publication 1 accuses Mrs. Chiles of "child sex abuse," which is a crime of moral turpitude, and the contents of Publication 1 are likely to harm Mrs. Chiles's reputation.  (*Id.* ¶¶ 83, 233, 243.)  Publication 15 states that Mrs. Chiles and Dr. Chiles are "accomplices to sex abuse," which imputes to both individuals a crime of moral turpitude and is likely to harm their reputations.  (*Id.* ¶¶ 148, 233, 243.)  Publication 16 describes Mrs. Chiles as a "child sex abuse accomplice," thereby imputing to her a crime

of moral turpitude and likely damaging her reputation. (*Id.* ¶¶ 152, 233, 243.)  Thus,
Counterclaim Plaintiffs have sufficiently alleged that Publications 1, 15, and 16 are
defamatory *per se* and also actionable under Virginia common law defamation.  *See*
*Hatfill*, 416 F.3d at 330–31; *Chapin*, 993 F.2d at 1092.  Counterclaim Plaintiffs have also
sufficiently alleged that Ms. Kissinger-Stankevitz had the requisite intent when she made
Publications 1, 15, and 16.  (Countercl. ¶¶ 229–32, 240–43); *see Ransome*, 2017 WL
1437100, at *4.  Accordingly, Counterclaim Plaintiffs have plausibly shown claims for
defamation *per se* and common law defamation; as such, Counts V and VI will not be
dismissed.

### B.  Count VII: Malicious Prosecution against Ms. Kissinger-Stankevitz

Counterclaim Defendant Ms. Kissinger-Stankevitz argues that Count VII should
be dismissed because Counterclaim Plaintiffs have failed to allege facts that show that a
prosecution occurred.  (Countercl. Defs.' Mem. in Supp. at 6.)  However, Ms. Kissinger-
Stankevitz acknowledges that she has initiated several law enforcement investigations.
(*Id.* at 6.)  Counterclaim Plaintiffs base their allegations on five actions: "(1) the Essex
County DSS Complaint, (2) the malicious efforts to convince the Essex County
Commonwealth's Attorney to Prosecute Dr. Bailey, (3) the Chesapeake Juvenile and
Domestic Relations (JDR) Court Protective Order, (4) the York-Poquoson Sherriff's
Office Complaint, and (5) the Newport News Police Department Complaint."
(Countercl. Pls.' Mem. in Opp'n at 6 (internal citations omitted).)

To prevail on a malicious prosecution claim under Virginia law, "[t]he plaintiff
must allege and prove that: (1) the prosecution was set on foot by the defendant and was

terminated in a manner not unfavorable to the plaintiff; (2) it was instituted or procured

by the cooperation of the defendant; (3) it was without probable cause; and (4) it was

malicious." *Ayyildiz v. Kidd*, 266 S.E.2d 108, 110 (Va. 1980). As a threshold matter a

plaintiff must allege facts to show that a prosecution did in fact occur. *See Mayberry v.*

*Ememessay, Inc.*, 201 F. Supp. 2d 687, 699 (W.D. Va. 2002) (requiring that "process

must be issued for the purpose of bringing the accused before a court, an indictment must

be returned, or the person must be arrested" (citing *Almy v. Grisham*, No. CL00-8427,

2001 WL 34037324, at \*5 (Va. Cir. Ct. July 29, 2001)). However, even in the absence of

a criminal prosecution, a plaintiff can bring a malicious prosecution claim for the

initiation of a groundless *civil* proceeding. *See Donohoe Constr. Co., Inc. v. Mt. Vernon*

*Assocs.*, 369 S.E.2d 857, 862 (Va. 1988) (citing *Ailstock v. Moore Lime Co.*, 52 S.E. 213,

215 (Va. 1905)). To state a claim for a malicious prosecution action predicated on a civil

proceeding, the plaintiff must allege facts to show "arrest of his person, seizure of his

property, or special injury." *Id.* (citing *Ayyildiz*, 266 S.E.2d at 111). "The special injury

restriction requires allegation and proof of a special loss or unusual hardship resulting

from the malicious prosecution." *Ayyildiz*, 266 S.E.2d at 111 (internal quotations

omitted). The special injury requirement is not satisfied if the plaintiff in the original

prosecution only sustains injuries that are "a common and often unavoidable burden on

defendants" in similar cases. *Id.*

Here, neither the Essex County Commonwealth's Attorney, the York-Poquoson

Sherriff's Office, nor the Newport News Police Department complaints led to service of

process, indictment, or arrest of Dr. Bailey. (Countercl. ¶¶ 43–47, 58–71.) Thus, the

investigations spurred by Ms. Kissinger-Stankevitz's reports to those agencies are insufficient as a matter of law to qualify as criminal proceedings. *See Almy*, 55 Va. Cir. at 407. Furthermore, neither EDSS nor the Chesapeake Juvenile and Domestic Relations Court are entities with the authority to arrest suspected criminals and try criminal cases, so Ms. Kissinger-Stankevitz's initiations of actions by those entities cannot be the basis of a malicious prosecution claim predicated on a criminal investigation. *See Petherbridge v. Bell*, 132 S.E. 683, 684 (Va. 1926) ("[Merely] [f]urnishing information to an officer who has no authority to arrest and try, does not constitute basis for malicious prosecution.").

Dr. Bailey also fails to state a claim for malicious prosecution predicated on civil proceedings because he did not allege facts showing an arrest of his person, seizure of his property, or special injury. *See Donohoe Constr.*, 369 S.E.2d at 862. Although the initiation of the Chesapeake Juvenile and Domestic Relations Court proceeding did result in Dr. Bailey being prohibited from seeing his son (Countercl. ¶ 52), this is the type of injury that is common and the unavoidable results of a protective order proceeding in juvenile and domestic relations courts. *See Nelson v. Green*, 965 F. Supp. 2d 732, 752 (W.D. Va. 2013) (holding restriction of visitation rights for over four (4) years was a secondary consequence to a child abuse petition and not a special injury). Thus, this injury, while undoubtedly burdensome for Dr. Bailey, does not qualify as a special injury. *See Ayyildiz*, 266 S.E.2d at 111. Consequently, Count VII will be dismissed without prejudice.

### C. Count VIII: Tortious Interference with Contract against Ms. Kissinger-Stankevitz and Stankevitz

The parties disagree which standard the Court should apply to a claim for tortious interference with contract. *Compare DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 670 S.E.2d 704, 706 (Va. 2009), *with Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 863–64 (E.D. Va. 1999). Counterclaim Defendants argue that Dr. Bailey fails to state a claim for tortious interference with contract because he has not alleged any facts showing a breach of contract. (Countercl. Defs.' Mem. in Supp. at 7.) They assert that Counterclaim Plaintiff merely alleges that Counterclaim Defendants "attempt[ed] to cause a breach" of Counterclaim Plaintiff's employment contract by sending the letter to Dr. Bailey's employer, and tortious interference with contract requires a completed breach. (*Id.* (quoting Countercl. ¶ 255).) Counterclaim Defendants also argue that the Counterclaim fails to allege damages. (Countercl. Defs.' Reply at 5.) However, Counterclaim Defendants cite a case applying Maryland law to support their assertion that interference with contract requires "actual damage," and they cite no cases to support their argument that damage to one's professional reputation does not constitute actual damages. (*Id.*).

Counterclaim Plaintiffs argue that Dr. Bailey's suspension from his employment constituted a breach of his contract with his employer. (Countercl. Pls.' Mem. in Opp'n at 7.) Dr. Bailey also argues that the alleged harm to his professional reputation caused by the Letter to his employer constitutes damages. (*Id.*)

The Court holds that the controlling standard in this case is set forth in

*DurretteBradshaw*. *See* 670 S.E.2d at 706; *see also* 18 Michie's Jurisprudence *Torts*

§ 2.1 (2024). Accordingly, the elements of tortious interference with contract under

Virginia law are

> [1] the existence of a valid contractual relationship or business expectancy;
> [2] knowledge of the relationship or expectancy on the part of the interferor;
> [3] intentional interference inducing or causing a breach or termination of the
> relationship or expectancy; and [4] resultant damage to the party whose
> relationship or expectancy has been disrupted.

*DurretteBradshaw*, 670 S.E.2d at 706 (citing *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va.

1985)). Courts throughout the Fourth Circuit have consistently applied this standard.

*See, e.g.*, *Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 210 (4th

Cir. 2001) (quoting *Chaves*, 335 S.E.2d at 102); *see also Phoenix Renovation Corp. v.*

*Rodriguez*, 461 F. Supp. 2d 411, 427 (E.D. Va. 2006) (quoting *Chaves*, 335 S.E.2d at

102) (applying the four (4) element standard to a claim for tortious interference with an

employment contract), *aff'd*, 258 F. App'x 526 (4th Cir. 2007). A fifth element of

tortious interference with contract, which requires that the plaintiff show that the

defendant used "improper methods," arises only when the contract at issue was

terminable at will. *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va.

2014). Improper methods include "means that are illegal or independently tortious,"

including "defamation," as well as those that "violate an established standard of a trade or

profession or involve unethical conduct." *Dunn, McCormack & MacPherson v.*

*Connolly*, 708 S.E.2d 867, 870 (Va. 2011) (quoting *Duggin v. Adams*, 360 S.E.2d 832,

836–37 (Va. 1987)).

Here, Counterclaim Plaintiffs have sufficiently alleged that there was a valid contractual relationship between Dr. Bailey and Signify Health and Counterclaim Defendants knew of that contract. (*See* Countercl. ¶¶ 156–73, 253, 254, Ex. BB)  These allegations satisfy the first and second elements of tortious interference with contract. *See DurretteBradshaw*, 670 S.E.2d at 706.  Furthermore, Mr. Stankevitz's letter to Signify Health plausibly constitutes an intentional interference with Dr. Bailey's contract, and that interference plausibly caused a breach when Signify Health suspended Dr. Bailey. (Countercl. ¶¶ 156–68, 171); *see DurretteBradshaw*, 670 S.E.2d at 706.  Finally, Counterclaim Plaintiffs allege severe damage to Dr. Bailey's professional reputation resulting from Mr. Stankevitz's letter (Countercl. ¶ 172), which satisfies the "resultant damage" requirement for tortious interference with contract, *see DurretteBradshaw*, 670 S.E.2d at 706.

Neither party here has alleged that the contract at issue was terminable at will. Thus, Counterclaim Plaintiffs do not need to allege facts showing Counterclaim Defendants used improper means to interfere with Dr. Bailey's contract. *See Dunlap*, 754 S.E.2d at 318.  Nevertheless, Counterclaim Plaintiffs have adequately alleged that the Letter through which Counterclaim Defendants interfered with Dr. Bailey's contract was defamatory, i.e., an improper means. *See supra* Section V.A.ii.  Consequently, if later discovery shows that Dr. Bailey's contract is terminable at will, Counterclaim Plaintiffs have alleged facts showing that Counterclaim Defendants used improper means to interfere with Dr. Bailey's contract. *See Dunn, McCormack & MacPherson*, 708 S.E.2d

at 870.  Consequently, Counterclaim Plaintiffs have stated a claim for tortious

interference with contract.

However, as the Court previously discussed, Counterclaim Plaintiffs have not

alleged any facts showing Ms. Kissinger-Stankevitz's involvement in the Letter to

Signify Health.  Accordingly, Count VII against Ms. Kissinger-Stankevitz will be

dismissed without prejudice.  Count VII is not dismissed against Mr. Stankevitz.  The

Court grants Counterclaim Plaintiffs leave to amend the Counterclaim, if Counterclaim

Plaintiffs can allege additional facts that show Ms. Kissinger-Stankevitz's involvement in

the letter.

## D. Count IX: Common Law Conspiracy against Ms. Kissinger-Stankevitz and Stankevitz

Counterclaim Defendants argue that Count IX should be dismissed because the

Counterclaim fails to allege facts showing an agreement between Mr. Stankevitz and Ms.

Kissinger-Stankevitz and fails to allege sufficiently specific facts regarding a concerted

action in furtherance of the conspiracy.  (Countercl. Defs.' Mem. in Supp. at 7;

Countercl. Defs.' Reply at 5–6.)  Counterclaim Plaintiffs argue that the Counterclaim's

allegations that Mr. Stankevitz and Ms. Kissinger-Stankevitz worked together to

tortiously interfere with Dr. Bailey's contract was a sufficient statement of concerted

action.  (Countercl. Pls.' Mem. in Opp'n at 7–8.)

"Under Virginia law, '[a] civil conspiracy is a combination of two or more

persons, by some concerted action, to accomplish some criminal or unlawful purpose, or

to accomplish some purpose, not itself criminal or unlawful, by criminal or unlawful

means.'" *Barrett*, 975 F.3d at 435–36 (quoting *Hechler Chevrolet*, 337 S.E.2d at 748).

"Additionally, Plaintiff must at least plead the requisite concert of action and unity of

purpose in more than mere conclusory language." *Remacle v. Repperio, Inc.*, No. 1:17-

cv-434, 2017 WL 11505574, at *12 (E.D. Va. Aug. 25, 2017) (quoting *Bay Tobacco*, 261

F. Supp. 2d at 499 (internal quotation omitted).

Here, Counterclaim Plaintiffs allege that Mr. Stankevitz and Ms. Kissinger-

Stankevitz "worked together" and engaged in "concerted action" in furtherance of a

tortious interference with Dr. Bailey's contract. (Countercl. ¶¶ 260–61.) Counterclaim

Plaintiffs do not allege any more specific facts as to how Mr. Stankevitz and Ms.

Kissinger-Stankevitz acted in concert to accomplish their alleged purpose of interfering

with Dr. Bailey's contract. The allegations of concerted action in the Counterclaim are

merely conclusory statements of concerted action. The Counterclaim states that the

Letter Mr. Stankevitz sent included documents that Ms. Kissinger-Stankevitz had posted

on social media, but it does not provide sufficient facts to plausibly show that his wife

gave the documents to him, or that he could only have received those documents from

her. (Counterclaim Compl. ¶ 167.) Consequently, Counterclaim Plaintiffs have failed to

state a claim for civil conspiracy. *See Remacle*, 2017 WL 11505574, at *12.

Accordingly, Count IX will be dismissed without prejudice. The Court grants

Counterclaim Plaintiffs leave to amend the Counterclaim if they can allege a concerted

act with greater specificity.

### E.  Counts X–XI: Injunction against Further Filing of False Police / DSS Complaints against Ms. Kissinger-Stankevitz and Injunction against Further Defamation against Ms. Kissinger-Stankevitz and Stankevitz

Counterclaim Defendants argue that the Counterclaim fails to allege an irreparable injury, that monetary damages are sufficient to remedy the alleged harm, that the balance of hardships between the parties does not warrant equitable remedy, and that injunctive relief would be detrimental to the public interest. (Countercl. Defs.' Mem. in Supp. at 8.) Consequently, they argue that Counterclaim Plaintiffs' request for injunctive relief should be denied. (*Id.* at 9.)

Conversely, Counterclaim Plaintiffs argue that the harm to their reputations and Dr. Bailey's career caused by Counterclaim Defendants' defamatory statements and false reports is irreparable. (Countercl. Pls.' Mem. in Opp'n at 8.) Counterclaim Plaintiffs identify several cases where Virginia courts have found injunctive relief to be an appropriate remedy for defamation. (*Id.* at 9.)

> To obtain a permanent injunction, the party seeking the injunction must show
>
> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Even if the party seeking the injunction makes such a showing, the Court maintains discretion on whether to grant an injunction. *Id.* "An injunction must be specific in terms, and it must define the exact extent of its operation so that there may be compliance." *B2Gold Corp.*

*v. Christopher*, No. 1:18-cv-1202, 2020 WL 4746465, at \*8 (E.D. Va. Apr. 24, 2020)

(quoting *Unit Owners Ass'n v. Gillman*, 292 S.E.2d 378, 387 (Va. 1982)) (internal

quotations omitted), *report and recommendation adopted*, No. 1:18-CV-1202, 2020 WL

2846633 (E.D. Va. May 28, 2020).

Here, Counterclaim Plaintiffs have sufficiently alleged that Counterclaim

Defendants' numerous defamatory statements and false reports to law enforcement and

social services agencies damaged Counterclaim Plaintiffs' reputations and prejudiced Dr.

Bailey in his profession. (*See* Countercl. ¶¶ 172, 183–86, 211, 232–33, 243–44, 263.)

Continued defamatory statements and false reports by Counterclaim Defendants would

continuously and irreparably harm Counterclaim Plaintiffs. *Levine v. Meador*, No. 1:20-

cv-1073, 2022 WL 18912678, at \*12 (E.D. Va. Mar. 29, 2022) (holding that the plaintiff

stated a claim for relief enjoining future defamatory statements by alleging facts showing

that continued defamatory statements would cause irreparable injury), *report and*

*recommendation adopted*, No. 1:20-cv-1073, 2022 WL 18912217 (E.D. Va. Aug. 18,

2022). Counterclaim Plaintiffs have alleged that Counterclaims Defendants' conduct is

unlikely to stop (Countercl. ¶¶ 266, 269), which supports the inference that monetary

damages would be insufficient to remedy Counterclaim Plaintiffs' injuries. *See Levine*,

2022 WL 18912678, at \*12. Furthermore, a narrowly constructed injunction against

Counterclaim Defendants' filing of false claims and making knowingly defamatory

statements would not substantially burden Counterclaim Defendants. *See id.* Finally,

injunctive relief would be in the public interest by stopping the spread of false

information and the filing of false reports. *See id.*; *Matheson v. Lawson*, Case No.:

CL19-6289, 111 Va. Cir. 564, 569 (2020) (holding that it is in the public interest to enjoin the defendant from filing false claims).  Thus, viewing the alleged facts in the light most favorable to Counterclaim Plaintiffs, the Counterclaim adequately states a claim for permanent injunctions against Counterclaim Defendants.[14]

## V.  CONCLUSION

For the foregoing reasons, the Motions will be resolved accordingly.  An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: Sept. 26, 2024
Richmond, Virginia

---

[14] The specific terms of the injunctions requested by Counterclaim Plaintiffs are overly broad. However, Counterclaim Plaintiffs have sufficiently stated a plausible claim for more narrowly tailored injunctive relief.